Opinion issued October 8, 2015



In The

# Court of Appeals

For The

## First District of Texas

———————————

NO. 01-12-01108-CV

———————————

**TELICIA OWENS, Appellant**

**V.**

**KRISTA G. HANDYSIDE, M.D., SAMUEL J. PRATER, M.D., KENNETH A. TOTZ, D.O., FACEP, AND MEMORIAL HERMANN HOSPITAL SYSTEM D/B/A MEMORIAL HERMANN – TEXAS MEDICAL CENTER, Appellees**

On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Case No. 2012-07534

**OPINION ON REHEARING**

Appellees, Krista G. Handyside, M.D., Samuel J. Prater, M.D., Kenneth A. Totz, D.O., FACEP,[1] and Memorial Hermann Hospital System, doing business as Memorial Hermann – Texas Medical Center ("Memorial Hermann"),[2] have filed motions for rehearing and motions for en banc reconsideration of our April 23, 2015 opinion and judgment. We deny their motions for rehearing, withdraw our opinion and judgment of April 23, 2015, and issue the following opinion and a new judgment in their stead. Because we issue a new opinion in connection with the denial of rehearing, appellees' motions for en banc reconsideration of our April 23, 2015 opinion are rendered moot. *See, e.g.*, *Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 41 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

Appellant, Telicia Owens, challenges the trial court's dismissal of her health care liability claims[3] against Drs. Handyside, Prater, and Totz and Memorial Hermann. In three issues, Owens contends that the trial court erred in dismissing her claims on the grounds that she failed to timely serve her medical expert report

---

[1] Owens sued "Kenneth A. Totz, M.D." We note that, in his answer, Dr. Totz identifies himself as "Kenneth A. Totz, D.O., FACEP," as does the trial court in its dismissal order. Our style of the case is in accord with the trial court's dismissal order. *See Strobel v. Marlow*, 341 S.W.3d 470, 471 n.1 (Tex. App.—Dallas 2011, no pet.).

[2] Owens sued "Memorial Hermann Healthcare System d/b/a Memorial Hermann Hospital." In its answer, Memorial Hermann stated that it was incorrectly named. In its dismissal order, the trial court identifies Memorial Hermann as "Memorial Hermann Hospital System d/b/a Memorial Hermann – Texas Medical Center." Our style of the case is in accord with the trial court's dismissal order. *See id.*

[3] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (Vernon Supp. 2014).

2

on appellees, her medical expert is not qualified to opine on the standard of care of hospital emergency room doctors, and her report insufficiently addresses the issues of standard of care and causation.[4]

We reverse and remand.

## Background

In her petition, Owens alleges that on February 6, 2010, she went to the "Emergency Department at Memorial Hermann," complaining of a "severe headache." She was diagnosed with a "migraine, tension headache, and headache associated with sinuses," but "[n]o diagnostic testing was done to rule out any internal problems." On February 10, 2010, Owens "returned to the Emergency Department at Memorial Hermann," complaining of the "same persisting symptoms." Dr. Handyside diagnosed her as suffering from a "headache and sinitus." Again, no diagnostic testing was performed. On February 21, 2010, Owens "returned again to the [E]mergency [D]epartment at Memorial Hermann," complaining of a "headache and blurry vision." Drs. Prater and Totz treated her,

---

[4] *See id.* § 74.351(a) (Vernon Supp. 2014) (governing medical expert reports). In 2013, the legislature amended section 74.351 of the Texas Medical Liability Act. *See* Act of May 26, 2013, 83d Leg., R.S., ch. 870, § 2, 2013 Tex. Sess. Law Serv. 2220, 2220. The amended provision applies to all suits filed after September 1, 2013. Because Owens filed her original petition in 2010, we apply the former version of section 74.351 to her claims. *See* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590 (amended 2013) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351).

3

and they diagnosed her as suffering from a "headache." No diagnostic testing was performed.

Subsequently, on February 24, 2010, Owens went to "Methodist Hospital [("Methodist")] for [an] assessment of the same symptoms that she complained of at Memorial Hermann." Doctors administered a "CT scan," which showed that she was suffering from a "head bleed." Methodist admitted Owens into its "Intensive Care Unit," and it discharged her on March 3, 2010.

On April 22, 2010, Owens went to "Ben Taub General Hospital [("Ben Taub"),] complaining of sudden blindness, which resulted in [the] placement of a lumbar shunt." On May 14, 2010, she returned to Ben Taub, "complaining of sutures coming out, shunt leak[age], blurred vision, and [a] headache." Ben Taub admitted Owens for evaluation and subsequently discharged her. On May 17, 2010, Owens again returned to Ben Taub, "complaining of [a] headache, chest pain, and neck stiffness." Her shunt was infected, and it was removed. Owens was "found to have been infected with MRSA—Methicillin Resistant Staphyloccus Aureus."

Owens further alleges that she sustained "permanent damage to her optic nerve and is completely blind in both of her eyes. She has continuous subsequent damage and pain." However, Owens does not specify in her petition the medical cause or reason for her loss of vision and residual "damage and pain."

Owens brings health care liability claims against Drs. Handyside, Prater, and Totz for negligence and gross negligence, specifically alleging that they:

- Failed to obtain an accurate assessment of Owens;

- Failed to notice signs and symptoms of "Cerebral Venous Sinus Thrombosis" ("CVST");

- Failed to accurately and timely diagnose Owens;

- Failed to consider possible explanations and respond to severe headaches and blurry vision;

- Failed to order appropriate radiological studies;

- Failed to make a medical diagnosis based on Owens's clinical condition;

- Failed to consult with a neurologist or other specialist while Owens was in the emergency department;

- Failed to develop and carry out a proper treatment plan for Owens;

- Failed to admit Owens to the "Neurological ICU";

- Failed to order thrombolytic medication necessary to attempt to dissolve the thrombosis;

- Failed to adhere to "Federal Laws regarding EMTALA regarding emergently treating a patient regardless of [her] inability to pay";

- Failed to order appropriate diagnostic tests and treatments even once CVST was suspected as a possible cause of Owens's symptoms; and

- Negligently managed a patient with CVST.

Owens likewise brings direct-liability claims for negligence and gross negligence against Memorial Hermann, specifically alleging that it:

- Failed to select and retain only competent physicians and staff;

- Failed to properly supervise the health care providers who treated Owens;

- Failed to enforce or have in place policies, protocols, by-laws, rules and regulations regarding proper diagnosis and treatment of Owens's medical condition;

- Failed to enforce or have in place policies and protocols, with regard to consulting specialty physicians;

- Failed to have a medical director or chief of staff in place to properly supervise physicians and staff; and

- Failed to abide by recommendations and requirements of healthcare certifying organizations.

"As a result of the above-noted acts of negligence," Owens asserts that appellees "directly and proximately caused" her "injuries, losses, and damages." She also alleges that Memorial Hermann is vicariously liable for the negligent "acts and/or omissions" of its staff, including, among others, Drs. Handyside, Prater, and Totz.

To support her claims, Owens, on or about May 29, 2012, filed and served upon all appellees a medical expert report authored by Brian C. Richardson, M.D. Appellees objected to Dr. Richardson's report on several grounds, including that Owens did not timely serve it; it failed to sufficiently address the elements of

standard of care, breach of the standard, and causation; and Richardson, a neurologist, is not qualified to opine on the standard of care of hospital emergency room doctors or causation.

Specifically, Dr. Totz filed his objection to the sufficiency of Dr. Richardson's report on June 19, 2012, stating:

> In support of [Owens's] health care liability claim, and pursuant to Texas Civil Practice & Remedies Code § 74.351(a), [Owens] offered the report of Dr. Richardson. . . .
>
> In accordance with Texas Civil Practice and Remedies Code § 74.351(a), Dr. Totz's Objection is filed within twenty-one (21) days of the date of *service* of Dr. Richardson's expert report.

(Emphasis added.) Totz also attached to his objection, as "Exhibit A," Richardson's report, as well as its accompanying transmittal letter, which were both sent by Owens to all appellees on May 29, 2012.

Owens, on July 17, 2012, filed her response to appellees' objections, asserting that she "served [Dr. Richardson's] expert report upon all Defendants . . . on May 29, 2012." Attached to Owens's response were United States Postal Service ("USPS") certified mail receipts and "green cards," which evidence service of Dr. Richardson's expert report on appellees by certified mail. However, the signature line on the green card for Dr. Totz does not contain a signature, and both the USPS certified mail receipt and the green card pertaining to him contain the wrong zip code for his personal residence.

7

On August 15, 2012, Dr. Totz filed a "Supplemental Objection" to Dr. Richardson's expert report, moving to dismiss Owens's claims against him for failure to timely serve him with the report. Totz attached to his supplemental objection his affidavit and the affidavit of his attorney, Charles B. Holm. Totz testified that he had "never received a copy of Dr. Richardson's Expert Report *via* certified mail, return receipt requested at [his] personal residence," he "never executed" the specific green card attached to Owens's response, and he was not "served" in person with the expert report. Although Holm testified that he had "never received a copy of Dr. Richardson's Expert Report from [Owens] or her attorney on or before June 6, 2012,"[5] and neither had anyone at his law firm, he conceded that he had "obtained a copy of Dr. Richardson's Expert Report through [unspecified] alternative means." Owens did not file a response to Totz's supplemental objection.

After a hearing, the trial court sustained Dr. Totz's specific objection that Owens had failed to timely serve him with Dr. Richardson's expert report, and it dismissed Owens's claims against him. It also sustained the objections of Memorial Hermann and Drs. Handyside and Prater as to the sufficiency of

---

[5] Owens was required to serve her expert report by June 6, 2012—120 days after the date she filed her original petition. *See* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590 (amended 2013) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)).

8

Richardson's expert report, but it allowed Owens thirty days to file and serve upon them an amended report.

Owens then served Dr. Richardson's amended medical expert report on Memorial Hermann and Drs. Handyside and Prater. In Richardson's amended report, he notes that he is a "physician in private practice," is "licensed to practice medicine in the State of California," and is "board certified in adult neurology and vascular neurology by the American Board of Psychiatry and Neurology." Richardson further states:

> I have knowledge of [the] accepted and established standards of medical care for the patient[']s diagnosis that is involved in the claim. I obtained this knowledge via my residency and fellowship training as well as via experience[] gained in the practice of neurology for over 19 years.
>
> . . . .
>
> As a neurologist board certified in general adult neurology and vascular neurology[,] I have seen, diagnosed and managed many patients with dural sinus thrombosis. I have also seen, diagnosed and managed many patients with idiopathic intracranial hypertension (formerly referred to as pseudotumor cerebri or benign intracranial hypertension). As such[,] I am familiar with the standard of care for the diagnosis, care and treatment of both dural sinus thrombosis and idiopathic intracranial hypertension.

Richardson also explains that he reviewed Owens's medical records prior to forming his opinions.

Dr. Richardson notes that the applicable standard of care for Dr. Handyside, concerning a patient complaining of,

a severe headache of one week duration . . . without a prior history of recurrent headaches would include cerebral imaging[,] such as [a] CT or preferably [a] brain MRI.  [A] [l]umbar puncture should have been performed as well.  A neurology consultation should have been obtained.  It should have been clear to the examining physician that the patient had a potentially serious neurological condition.  The differential diagnosis should have included dural sinus thrombosis.  The standard of care would also have included admission or urgent appropriate outpatient follow-up . . . .

In regard to the applicable standard of care for Dr. Prater, Richardson states the following:

[Owens was diagnosed with] rule out cavernous sinus thrombosis, rule out meningoenchephalitis. . . . These are two very serious diagnoses that should have prompted admission to the hospital and [an] urgent neurological consultation.  At the very least[,] neurodiagnostic studies[,] such as [a] lumbar puncture, [a] CT . . . or [a] brain MRI[,] should have been performed.  The standard of care for evaluating patients with possible meningitis is to perform a lumbar puncture right away.  Neurological consultation and neuroimaging[,] such as [a] CT . . . or [a] brain MRI[,] should be done promptly when cavernous sinus thrombosis is being entertained as a diagnosis.  Patients should be admitted to the hospital[,] rather than discharged when life-threatening diagnoses such as these are considered. . . . As stated above, cerebral imagining, [such as a] CT or preferably [a] brain MRI[,] should have been done.  A lumbar puncture should have been performed given the diagnoses of the examining physician[].

Finally, regarding the applicable standard of care for Memorial Hermann, Richardson notes that it "should have had protocols for evaluation, consultation, admission and follow-up that resulted in adequate care of patients with conditions such as dural sinus thrombosis and idiopathic intracranial hypertension.  The

failure to have in place and abide by such protocols was a bre[a]ch in the standard of care."

In regard to causation, Dr. Richardson opines:

If Dr. . . . Handyside had performed cerebral imaging[,] such as [a] CT or preferably [an] MRI, performed [a] lumbar puncture or obtained [a] neurological consultation[,] it is medically probable that . . . Owens would have had her condition diagnosed and treated in a timelier manner. Early treatment of dural sinus thrombosis reduces the likelihood of complications[,] such as idiopathic intracranial hypertension. Thus[,] her vision would have most likely been spared and she would not have lost vision in the right and left eyes. Severe loss of vision is a preventable complication of dural sinus thrombosis.

If Dr[.] . . . Prater performed [a] lumbar puncture, ordered cerebral imaging[,] such as [a] head CT and preferably [an] MRI, admitted [Owens to the hospital] and/or obtained [a] neurological consultation, . . . Owens would have likely had a more timely diagnosis, earlier treatment and her vision would medically probably have been saved. If . . . Prater had not prescribed dexamethazone for . . . Owens[,] it is medically probable that her condition would not have been exacerbated. It is possible she would not have progressed to . . . have [a] loss of vision.

. . . .

Memorial Herman[n] . . . failed to have and/or implement adequate protocols for evaluation, consultation, admission and follow-up that resulted in [in]adequate care of this patient with dural sinus thrombosis and idiopathic intracranial hypertension. The failure to have in place and abide by such protocols was a bre[a]ch in the standard of care that was a proximate cause of . . . Owens subsequently developing blindness in the right and left eyes.

(Footnote omitted.) Richardson further opines:

. . . Owens developed dural sinus thrombosis . . . . This is an uncommon, but well known condition that is treatable with

11

anticoagulant medications. There was a significant delay in the diagnosis of this condition. This delay resulted in the development of a complication, severe vision loss due to idiopathic intracranial hypertension. Severe vision loss due to intracranial complication can generally be easily treated with medication if it is diagnosed early. In the case of failure of medications, serial lumbar punctures can be done in some cases. Surgical procedures[,] such as lumboperitoneal shunt placement[,] are effective second line treatments. Optic nerve fenestration is an effective third level of treatment . . . .

And he explains: "Untreated dural sinus thrombosis is well known to potentially cause idiopathic intracranial hypertension. Idiopathic intracranial hypertension may progress to blindness if untreated. It is medically probable that early diagnosis would have prevented [Owens's] later development of vision loss." (Footnote omitted.)

Memorial Hermann and Drs. Handyside and Prater objected to Dr. Richardson's amended medical expert report and moved to dismiss Owens's claims against them on the grounds that Richardson is not qualified to opine on the standard of care for hospital emergency room doctors and his report insufficiently addresses the issues of standard of care and causation. Drs. Handyside and Prater also reasserted their untimeliness objections. Without stating its reasons, the trial court granted the motions of Memorial Hermann and Drs. Handyside and Prater and dismissed Owens's health care liability claims against them.

## Standard of Review

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). When reviewing matters committed to a trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris Cty. Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

We review questions of law de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009); *CHCA W. Hous., L.P. v. Priester*, 324 S.W.3d 835, 837 (Tex. App.—Houston [14th Dist.] 2010, no pet.). And to the extent an issue involves statutory interpretation, we apply a de novo standard of review. *See Stockton v. Offenbach*, 336 S.W.3d 610, 615 (Tex. 2011); *Priester*, 324 S.W.3d at 837. "[W]hether proper service [under Texas Civil Practice and Remedies Code section 74.351] has been made is a question of law . . . ." *Nexion Health at*

13

*Beechnut, Inc. v. Paul*, 335 S.W.3d 716, 718 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *see also Univ. of Tex. Health Sci. Ctr. of Hous. v. Gutierrez*, 237 S.W.3d 869, 871 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (noting whether defendant properly served constituted "a purely legal issue").

### Timeliness of Expert Report

In her first issue, Owens argues that the trial court erred in dismissing her claims against Dr. Totz because he admitted in his objection to Dr. Richardson's expert report, filed on June 19, 2012, that he had been timely served with the report and he waived his untimeliness objection by waiting "until August 15, 2012, more than two months after the expiration of the 120-day deadline," to raise the issue.[6] Totz argues that Owens "failed to preserve her argument regarding [his] admission" of timely service of Richardson's expert report because she did not "ever raise the argument" in the trial court. Totz also argues that Owens did not preserve her "waiver" argument because "[i]n her [appellate] [b]rief, for the very first time, [Owens] takes issue with the . . . fact that he did not file his

---

[6] In her brief, Owens also asserts that she timely served Dr. Richardson's report on Memorial Hermann and Drs. Handyside and Prater. In response, Drs. Handyside and Prater state that they "no longer object to the timeliness of the expert report of Dr. Richardson." Similarly, in its brief, Memorial Hermann states: "On or about May 30, 2012, [Owens] timely served on [Memorial Hermann] an initial expert report of Brian C. Richardson, M.D." Accordingly, we do not address this portion of Owens's first issue.

14

[s]upplemental [o]bjection[] until more than two months after the expiration of the 120-day deadline." (Emphasis omitted.)

The former version of Texas Civil Practice and Remedies Code section 74.351, in effect at the time this suit was filed, provided that a health care liability claimant shall, "not later than the 120th day after the date the original petition [is] filed, serve on each party or the party's attorney one or more expert reports."[7] *See* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590 (amended 2013) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (Vernon Supp. 2014)). It further provided that if an expert report is not timely served, the affected health care provider may move to dismiss a claim asserted against him, and the court must dismiss the claim with prejudice. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b); *Heriberto Sedeno, P.A. v. Mijares*, 333 S.W.3d 815, 818, 822–23 (Tex. App.—Houston [1st Dist.] 2010, no pet.). A health care provider may waive his right to complain about the adequacy of an expert report by failing to challenge the report's adequacy within twenty-one days of service of the report. *See* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590 (amended 2013) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)); *Ogletree v. Matthews*, 262 S.W.3d 316,

---

[7] The legislature's 2013 amendment to section 74.351(a) requires each health care liability claimant to serve an expert report "not later than the 120th day after *each defendant's original answer* is filed." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (emphasis added).

15

321–22 (Tex. 2007). However, there is no deadline to file a motion to dismiss for failure to timely serve a chapter 74 expert report. *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003); *Heriberto*, 333 S.W.3d at 823–24. In other words, a health care provider does not waive his right to dismissal of an untimely served expert report by waiting to file his motion to dismiss. *See Jernigan*, 111 S.W.3d at 156–57 (waiting more than 600 days to move for dismissal). Accordingly, even assuming Owens preserved her "waiver" argument, we hold that Dr. Totz did not waive his right to complain about the untimeliness of service of Dr. Richardson's report by waiting until August 15, 2012 to file his supplemental objection and motion to dismiss.

Regarding Dr. Totz's argument that Owens "failed to preserve her argument regarding [his] admission" that he had been timely served with Dr. Richardson's expert report, we note that in reviewing a trial court's judgment, we may only consider what was before the trial court at the time it made its decision. *San Jacinto Methodist Hosp. v. Carr*, No. 01-07-00655-CV, 2008 WL 2186473, at *3 (Tex. App.—Houston [1st Dist.] May 22, 2008, no pet.) (mem. op.); *Hansen v. Starr*, 123 S.W.3d 13, 18 (Tex. App.—Dallas 2003, pet. denied); *see also* TEX. R. APP. P. 33.1(a). As Totz notes in his brief, Owens did not respond to his supplemental objection, filed on August 15, 2012, in which he raised the issue of

the untimely service of Richardson's report.[8]  And, thus, according to Totz, Owens never argued to the trial court that he had admitted to having been timely served with Richardson's report.  However, it was not necessary for Owens to have made this assertion in a response to Totz's August 15, 2012 supplemental objection.

Dr. Totz's attorney, Holm, in his affidavit attached to Totz's supplemental objection, conceded that he had "obtained a copy of Dr. Richardson's Expert Report."  And his affidavit testimony does not contain an affirmative statement that Totz was not timely served with the report.  Rather, Holm merely states that he "never received a copy of Dr. Richardson's Expert Report *from [Owens] or her attorney* on or before June 6, 2012" and neither had anyone at his law firm.  (Emphasis added.)

Likewise, Dr. Totz, in his affidavit, attached to his supplemental objection, does not affirmatively state that was not served with Dr. Richardson's report.  Rather, he states that he "never received a copy of Dr. Richardson's Expert Report *via certified mail, return receipt requested at [his] personal residence*," did not "execute[]" the specific green card attached to Owens's response to his June 19, 2012 objection, and was not "served" in person with the report.  (Emphasis added.)

---

[8]  Dr. Totz states in his brief:  "[A]t no point . . . in the interim between the August 15, 2012 filing of [his] [s]upplemental [o]bjection and the occurrence of the August 24, 2012 oral hearing regarding [his] objection and motion to dismiss, did [Owens] file any sort of argument, issue, objection, or any other motion in response to the arguments or evidence presented in [his] [s]upplemental [o]bjection."

17

Importantly, neither Dr. Totz nor his attorney, in their affidavit testimony, denies having been timely served with a copy of Dr. Richardson's expert report. *See* TEX. R. CIV. P. 21a (listing methods of service). And the trial court, at the time it made its decision to dismiss Owens's claims against Totz, had before it Holm's testimony that he had "obtained a copy of Dr. Richardson's Expert Report." *See Strobel v. Marlow*, 341 S.W.3d 470, 476 (Tex. App.—Dallas 2011, no pet.) ("Receipt is an element of service."). Accordingly, we hold that Owens did not fail to preserve her argument that Totz admitted to having been timely served with a copy of Richardson's expert report.[9] *See Hansen*, 123 S.W.3d at 18 (explaining we "consider what was before the trial court at the time it made its decision").

In regard to the merits of Owens's first issue, Dr. Totz argues that the trial court did not err in dismissing Owens's claims against him because, under a proper

---

[9] Dr. Totz also argues that Owens "waived her appellate issues" as to him because she did not reference, in her notice of appeal, the September 6, 2012 order granting Totz's motion to dismiss or serve Totz with certain documents filed in her appeal. As explained in our April 29, 2014 order, although Owens did not list the trial court's September 6, 2012 order granting Totz's motion to dismiss in her notice of appeal, "the rules do not require [her] to list in the notice of appeal every interlocutory ruling that [she] may wish to appeal." *See Ostrovitz & Gwinn, LLC v. First Specialty Ins. Co.*, 393 S.W.3d 379, 386 (Tex. App.—Dallas 2012, no pet.). Further, we note that "our decisions construing the appellate rules have not favored disposing of appeals on harmless procedural defects." *See Sweed v. Nye*, 323 S.W.3d 873, 875 (Tex. 2010); *see also Higgins v. Randall Cty. Sheriff's Office*, 257 S.W.3d 684, 688 (Tex. 2008) ("[W]e have long interpreted the Rules of Appellate Procedure liberally in favor of preserving appellate rights."); *Tex. S. Univ. v. Araserve Campus Dining Servs. of Tex., Inc.*, 981 S.W.2d 929, 935 n.12 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (docketing statement does not limit or waive party's appellate arguments).

construction of Civil Practice and Remedies Code section 74.351, she did not timely serve him with Dr. Richardson's expert report by certified mail "at [his] personal residence" or in person, even though he was in possession of the report, timely objected to its sufficiency, and attached to his June 19, 2012 objection, a copy of the report and its transmittal letter sent by Owens on May 29, 2012. *Cf.* TEX. R. CIV. P. 21a (listing methods of service); *Gutierrez*, 237 S.W.3d at 872 (same). However, the Texas Supreme Court has concluded otherwise on similar facts. *See Zanchi v. Lane*, 408 S.W.3d 373 (Tex. 2013). In *Zanchi*, the court specifically held:

> [W]e conclude, that, under section 74.351(a) of the TMLA, a physician or health care provider against whom [a health care liability claim] is asserted is a "party" who may be served with an expert report regardless of whether he has been served with process. We further hold that an expert report need not be "served" in compliance with the formal requirements of [Texas Rule of Civil Procedure] 106 [governing citation and service of process] that apply specifically to service of citation.

*Id*. at 380–81.

Here, the record reveals that Owens filed her petition on February 7, 2012, naming Dr. Totz as a defendant. She then served Dr. Richardson's initial expert report on all appellees, including Totz, on or about May 29, 2012. *See id.* at 380 (report properly served where plaintiff "sent the expert report on the statutory deadline"); *see also* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590 (amended 2013) (current version at TEX. CIV. PRAC. & REM.

19

CODE ANN. § 74.351(a)). Although the USPS certified mail receipt and green card attached to Owens's response show the wrong zip code for Totz's personal residence and he testified that he did not "receive[]" the expert report by certified mail "at [his] personal residence" and he was not "served" with the expert report in person, Totz and his attorney did timely obtain a copy of the report. *See Zanchi*, 408 S.W.3d at 380 (report properly served where defendant health care provider "actually received the expert report"); *see also Strobel*, 341 S.W.3d at 476 ("Receipt is an element of service."). And neither Totz nor his attorney ever *affirmatively denied* timely being served with Richardson's report. In fact, the report and its transmittal letter sent by Owens to all appellees on May 29, 2012 were attached to Totz's objection timely, which he filed on June 19, 2012.[10] *See* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590 (amended 2013) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)). Accordingly, we hold that the trial court erred in granting Totz's

---

[10] And Dr. Totz stated in his objection:

> In support of [Owens's] health care liability claim, and pursuant to Texas Civil Practice & Remedies Code § 74.351(a), [Owens] offered the report of Dr. Richardson. . . .

> In accordance with Texas Civil Practice and Remedies Code § 74.351(a), Dr. Totz's Objection is filed within twenty-one (21) days of the date of *service* of Dr. Richardson's expert report.

(Emphasis added.)

motion to dismiss Owens's claims against him on the ground that she failed to

timely serve him with Richardson's expert report.[11]

---

[11] This holding does not conflict with our prior decision in *University of Texas Health Science Center of Houston v. Gutierrez*, 237 S.W.3d 869 (Tex. App.—Houston [1st Dist.] 2007, pet denied). In *Gutierrez*, the issue was whether the University of Texas Health Science Center at Houston ("UTHSCH") was properly served with an expert report in accordance with Texas Civil Practice and Remedies Code section 74.351(a). 237 S.W.3d at 871. It was "undisputed" that the plaintiffs "never served UTHSCH" with their expert report and "did not send the report at all." *Id.* at 870, 873. Instead, UTHSCH received a courtesy copy of the report from another party prior to being named as a defendant in the plaintiffs' lawsuit. *Id.* at 870. We concluded that section 74.351(a) requires a plaintiff to serve an expert report on a defendant health care provider in a manner which complies with Texas Rule of Civil Procedure 21a. *Id.* at 872–73. And because the plaintiffs in *Gutierrez* did not serve the report "at all" on UTHSCH, we held that the trial court was required to dismiss their claims. *Id.* at 873–74.

Here, in contrast, the evidence is not "undisputed" that Owens wholly failed to serve Dr. Totz with Dr. Richardson's expert report or that Owens failed to "use any of the methods authorized by rule 21a to serve [her] expert report on [Totz] before the expiration of the statutory deadline." *Cf. id.* at 870, 872. Further, unlike the defendant health care provider in *Gutierrez*, Totz was actually served with Owens's expert report after he became a "party" to the lawsuit. *Cf. id.* at 870; *see also* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590 (amended 2013) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)) (requiring expert report to be served on "party"); *Zanchi v. Lane*, 408 S.W.3d 373, 377 (Tex. 2013) ("[T]he term 'party' means one named in a lawsuit . . . .").

The record reveals that Owens filed her petition, naming Dr. Totz as a defendant, on February 7, 2012. She then served her expert report on all appellees, including Totz, on or about May 29, 2012. Totz timely filed his objection to the adequacy of Owens's report on June 19, 2012—twenty-one days after it had been served upon him. In his objection Totz stated:

> In support of [Owens's] health care liability claim, and pursuant to Texas Civil Practice & Remedies Code § 74.351(a), [Owens] offered the report of Dr. Richardson. . . .

> In accordance with Texas Civil Practice and Remedies Code § 74.351(a), Dr. Totz's Objection is filed within twenty-one (21) days of the date of *service* of Dr. Richardson's expert report.

21

We sustain Owens's first issue, in part.

## Sufficiency of Expert Report

In her second issue, Owens argues that the trial court erred in dismissing her claims against Memorial Hermann and Drs. Handyside and Prater because "Dr. Richardson is fully qualified . . . to offer opinions in this case" and he adequately addresses the elements of standard of care and causation in his report.[12]

As noted above, a health care liability claimant must timely provide each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351; *Gray*, 189 S.W.3d at 858. The report must provide a "fair summary" of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standard, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

---

(Emphasis added.) Totz also attached to his objection, as "Exhibit A," the expert report as well as its accompanying transmittal letter, which were both sent by Owens to all appellees on May 29, 2012. Notably, neither Totz nor his attorney ever affirmatively denied having been timely served with Owens's expert report.

[12] Owens also asserts that Dr. Richardson's expert report adequately addresses the breach of the standard of care. However, neither Memorial Hermann nor Drs. Handyside or Prater objected to Richardson's report on this ground. Further, to the extent that Owens asserts that the report is sufficient in regard to Dr. Totz, we note that the trial court dismissed Owens's claims against Totz on the ground that she had not timely served him with the report. Accordingly, we do not address these portions of Owens's second issue.

22

If a defendant health care provider files a motion to dismiss, challenging the adequacy of a claimant's expert report, a trial court must grant the motion if it appears, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report or is not sufficiently specific to provide a basis for the trial court to conclude that the claims have merit. *Id.* § 74.351(l); *Scoresby v. Santillan*, 346 S.W.3d 546, 555–56 (Tex. 2011). In setting out the expert's opinions, the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct that the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the plaintiff's claims have merit. *Scoresby*, 346 S.W.3d at 556.

### *Dr. Richardson's Qualifications*

Owens first argues that the trial court, to the extent that it granted Drs. Handyside's and Prater's motions to dismiss her claims on the ground that Dr. Richardson is not qualified to address the standard of care, erred because "Richardson is more than qualified to offer []his opinion."[13] Owens asserts that it does not matter that Richardson is "not an emergency room physician" and he is

---

[13] Memorial Hermann did not challenge Dr. Richardson's qualifications, and Drs. Handyside and Prater only assert that Richardson is not qualified to opine on the standard of care of hospital emergency room doctors.

"more than qualified to testify about dural sinus thrombosis and idiopathic intracranial hypertension, the conditions involved in [Owens's] claim[s]."

In order to qualify as an expert, an individual need not be a specialist in the particular area of the profession for which testimony is offered. *Rittger v. Danos*, 332 S.W.3d 550, 558 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). However, merely being a doctor is insufficient. *See Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). Instead, "[a] medical [expert] who is not of the same school of medicine" must show that "he has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those confronting the defendant." *Marling v. Maillard*, 826 S.W.2d 735, 740 (Tex. App.—Houston [14th Dist.] 1992, no writ); *see also Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003) (doctor need not practice in particular field about which he opines if he demonstrates knowledge, skill, experience, training, or education regarding specific issue before court qualifying him to give opinion on issue); *Keo*, 76 S.W.3d at 732 ("[T]rial court may qualify a medical witness of a different specialty to testify . . . ."). Analysis of an expert's qualifications to opine as an expert on the subject matter of the report is limited to the four corners of the expert report or accompanying curriculum vitae. *See Mem'l Hermann Healthcare*

*Sys. v. Burrell*, 230 S.W.3d 755, 758 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

In order to opine on the standard of care, a person must (1) be "practicing medicine at the time such testimony is given or [have been] practicing medicine at the time the claim arose"; (2) have "knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim"; and (3) be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care." TEX. CIV. PRAC. & REM. CODE § 74.401(a) (Vernon 2011); *see also id.* § 74.351(r)(5)(A) (defining "expert," with respect to person opining as to whether doctor departed from accepted standards of medical care, as one "qualified to testify under the requirements of Section 74.401"). To determine whether a person is qualified on the basis of training or experience, the court shall consider whether he "is board certified or has other substantial training or experience in an area of medical practice relevant to the claim" and "is actively practicing medicine in rendering medical care services relevant to the claim." *Id.* § 74.401(c).

Drs. Handyside and Prater assert that "[i]n order to satisfy the expert report requirement of [c]hapter 74, [Owens] needed to serve on [them] an expert report from someone who is qualified to offer opinions on the standard of care as it

relates to the care they provided, as emergency [room] physicians." According to Drs. Handyside and Prater,

> Dr. Richardson's curriculum vitae and reports solely list his occupation as a medical doctor specializing in neurology. He also lists his clinical experience as that of being in private practice. He fails to show that he has any experience in emergency medicine . . . [and] fails to show that he has ever worked in an emergency department or worked closely with emergency [room] physicians in treating and diagnosing patients . . . .

(Internal citations omitted.)

In his expert report, Dr. Richardson notes that he is a "physician in private practice," "licensed to practice medicine in the State of California." He has been in "private practice for 19 years" and is "board certified in adult neurology and vascular neurology by the American Board of Psychiatry and Neurology." And Richardson further states:

> I have knowledge of [the] accepted and established standards of medical care for the patient[']s diagnosis that is involved in the claim. I obtained this knowledge via my residency and fellowship training as well as via experience[] gained in the practice of neurology for 19 years.
>
> . . . .
>
> As a neurologist board certified in general adult neurology and vascular neurology[,] I have seen, diagnosed and managed many patients with dural sinus thrombosis. I have also seen, diagnosed and managed many patients with idiopathic intracranial hypertension (formerly referred to as pseudotumor cerebri or benign intracranial hypertension). As such[,] I am familiar with the standard of care for the diagnosis, care and treatment of both dural sinus thrombosis and idiopathic intracranial hypertension.

Richardson's curriculum vitae also reveals that his fellowship focused on "[c]erebral blood flow and metabolism, and dementia," he completed his residency in the field of neurology, and has conducted research related to Alzheimer's disease, vascular dementia, and strokes.

In determining whether an expert is qualified, we must be careful not to draw expert qualifications "too narrowly." *Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006); *Adeyemi v. Guerrero*, 329 S.W.3d 241, 247 (Tex. App.—Dallas 2010, no pet.). The specific issue in this case is whether Drs. Handyside and Prater failed to timely and appropriately diagnose and treat Owens's conditions.

Dr. Richardson's report shows that he has experience in treating and diagnosing patients with the conditions suffered by Owens, namely dural sinus thrombosis and idiopathic intracranial hypertension. And he is familiar with the standard of care applicable to doctors who care for patients with the same conditions with which Owens presented. *See Tawa v. Gentry*, No. 01-12-00407-CV, 2013 WL 1694869, at *7 (Tex. App.—Houston [1st Dist.] Apr. 18, 2013, no pet.) (mem. op.) (expert sufficiently qualified to opine on standard of care by "showing the injury involved was of the type [the expert] treated in his practice" (internal quotation marks omitted)); *Hillery v. Kyle*, 371 S.W.3d 482, 487 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (concluding expert qualified, where expert stated familiarity "with the standards of care relevant to the condition

27

involved in th[e] claim" and he had "diagnosed and treated, 'patients with the conditions similar to those experienced by'" plaintiff); *Rittger*, 332 S.W.3d at 558–59 (noting focus not on defendant doctor's area of expertise, but on condition involved in claim).

Further, we note that the fact that Dr. Richardson is a neurologist, rather than an emergency room doctor, does not disqualify him as an expert in this case. *See Rittger*, 332 S.W.3d at 559 (holding neurologist/professor of medicine qualified to opine on standard of care in case against emergency room doctor who failed to diagnose stroke in pregnant patient, explaining fact patient "was pregnant when she experienced her stroke or that she presented herself in an emergency room setting does not require that [expert] be an obstetrician or emergency room physician"); *see also Hayes v. Carroll*, 314 S.W.3d 494, 504–05 (Tex. App.—Austin 2010, no pet.) (holding doctor, board certified in general and vascular surgery, qualified to render opinion on standard of care applicable to emergency room specialist); *Blan v. Ali*, 7 S.W.3d 741, 746–47 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (concluding neurologist qualified as expert on strokes, although defendant doctors were emergency room doctor and cardiologist).

We conclude that Dr. Richardson has the knowledge, skill, experience, education, or training to render an opinion on the standard of care applicable to a doctor treating a patient with the conditions with which Owens presented.

Accordingly, we hold that the trial court erred to the extent that it granted Drs. Handyside's and Prater's motions to dismiss Owens's claims on the ground that Richardson is not qualified to opine on the standard of care.

*Causation*

Owens next argues that the trial court, to the extent that it granted Drs. Handyside's and Prater's motions to dismiss her claims on the ground that Dr. Richardson did not adequately address the issue of causation, erred because Richardson, in his report, sufficiently addresses the element of causation as it related to the doctors.[14]

An expert report must provide a "fair summary" of the expert's opinions regarding the causal relationship between the failure of a health care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). In assessing the sufficiency of a report, a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report. *Wright*, 79 S.W.3d at 52. "No particular words or formality are

---

[14] Because of our disposition of Owens's third issue, we do not address the portion of her second issue in which she argues that the trial court erred to the extent that it granted Memorial Hermann's motion to dismiss her direct-liability claims against it on the ground that Dr. Richardson's report did not adequately address the elements of standard of care and causation. *See infra*.

required [in the expert report], but bare conclusions will not suffice." *Scoresby*, 346 S.W.3d at 556 (footnotes omitted).

A causal relationship is established by proof that a negligent act or omission constituted a substantial factor in bringing about harm and, absent the act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). However, an expert report need not marshal all of the plaintiff's proof necessary to establish causation at trial, and it need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court. *Wright*, 79 S.W.3d at 52; *Fortner v. Hosp. of the Sw., LLP*, 399 S.W.3d 373, 383 (Tex. App.—Dallas 2013, no pet.). The expert must simply provide some basis that the defendant health care provider's act or omission proximately caused injury. *Wright*, 79 S.W.3d at 52–53. And the expert must explain the basis of his statements and link his conclusions to the facts. *Id.* at 52. A report that merely states an expert's conclusions regarding causation is not sufficient. *Id.*; *Palacios*, 46 S.W.3d at 879. "[I]f an expert report contains only conclusions about [causation], the trial court has 'no discretion but to conclude . . . that the report does not represent a good-faith effort' to satisfy the statute." *Smith v. Wilson*, 368 S.W.3d 574, 577 (Tex. App.—Austin 2012, no pet.) (quoting *Palacios*, 46 S.W.3d at 877, 880).

In his expert report, Dr. Richardson explains:

> . . . Owens developed dural sinus thrombosis . . . . This is an uncommon, but well known condition that is treatable with anticoagulant medications. There was a significant delay in the diagnosis of this condition. This delay resulted in the development of a complication, severe vision loss due to idiopathic intracranial hypertension. Severe vision loss due to intracranial complication can generally be easily treated with medication if it is diagnosed early. In the case of failure of medications, serial lumbar punctures can be done in some cases. Surgical procedures[,] such as lumboperitoneal shunt placement[,] are effective second line treatments. Optic nerve fenestration is an effective third level of treatment . . . .

Further, Richardson notes: "Untreated dural sinus thrombosis is well known to potentially cause idiopathic intracranial hypertension. Idiopathic intracranial hypertension may progress to blindness if untreated. It is medically probable that early diagnosis would have prevented [Owens's] later development of vision loss." (Footnote omitted.)

In regard to Dr. Handyside, specifically, Dr. Richardson, in his report, states that she breached the standard of care "by failing to perform a fundiscopic examination and failing to perform cerebral imaging[,] such as [a] head CT or preferably [a] brain MRI." Further, "[t]he failure to obtain a neurology consultation . . . and the failure to admit the patient if urgent follow-up could not be obtained also constitutes a bre[a]ch of the standard [of] care." In regard to causation, Richardson opines:

> If Dr. . . . Handyside had performed cerebral imaging[,] such as [a] CT or preferably [an] MRI, performed [a] lumbar puncture or

obtained [a] neurological consultation[,] it is medically probable that . . . Owens would have had her condition diagnosed and treated in a timelier manner. Early treatment of dural sinus thrombosis reduces the likelihood of complications[,] such as idiopathic intracranial hypertension. Thus[,] her vision would have most likely been spared and she would not have lost vision in the right and left eyes. Severe loss of vision is a preventable complication of dural sinus thrombosis.

(Footnote omitted.)

Dr. Handyside asserts that Dr. Richardson "merely state[s] that had [she] . . . diagnosed [Owens], then [Owens] might have had a better outcome," but fails to explain "how [her] . . . conduct caused the permanent loss of vision." In other words, Richardson "does not explain how and why the complained of delay in diagnosis and treatment . . . were substantial factors in causing [Owens's] blindness."

An expert report must explain, to a reasonable degree, how and why the alleged breach caused the complained of injury based on the facts presented. *See Jelinek*, 328 S.W.3d at 539–40. Here, contrary to Dr. Handyside's assertions, Dr. Richardson's report does just that. Richardson opines that Handyside's failure to "perform[] cerebral imaging[,] such as [a] CT or preferably [an] MRI, perform[] [a] lumbar puncture or obtain[] [a] neurological consultation" resulted in a delay in the diagnosis and treatment of Owens's conditions. And "[t]his delay resulted in the development of a complication, severe vision loss due to idiopathic intracranial hypertension. Severe vision loss due to intracranial complication can generally be

easily treated with medication if it is diagnosed early." *Cf. Patterson v. Ortiz*, 412 S.W.3d 833, 839 (Tex. App.—Dallas 2013, no pet.) (holding sufficient report "show[ing] that performing the tests and examinations would have led to the diagnosis of pneumonia and Raul's admission to the hospital, where he would have received 'early, aggressive treatment [that], more likely than not, would have saved his life'"). An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff. *See McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.); *see also Woofter v. Benitez*, No. 01-09-00161-CV, 2009 WL 3930839, at *7 (Tex. App.—Houston [1st Dist.] Nov. 19, 2009, no pet.) (mem. op.) ("Dr. Flye's report sets forth a chain of events, involving breaches of the standard of care by each of the defendant physicians, which resulted in Islam's death.").

In regard to Dr. Prater, Dr. Richardson, in his report, states that Prater breached the standard of care by "fail[ing] to perform a lumbar puncture" on Owens, "fail[ing] to admit her" to the hospital, failing to "perform cerebral imagining[,] such as [a] head CT or [a] brain MRI," failing to "obtain a neurological consultation to have [Owens] assessed urgently despite the diagnoses of possible meningoencephalitis and possible cavernous sinus thrombosis," and failing to provide "adequate neurological follow-up" after Owens was discharged from Memorial Hermann. In regard to causation, Richardson opines:

> If Dr[.] . . . Prater performed [a] lumbar puncture, ordered cerebral imaging[,] such as [a] head CT and preferably [an] MRI, admitted [Owens to the hospital] and/or obtained [a] neurological consultation, . . . Owens would have likely had a more timely diagnosis, earlier treatment and her vision would medically probably have been saved. If . . . Prater had not prescribed dexamethazone for . . . Owens[,] it is medically probable that her condition would not have been exacerbated. It is possible she would not have progressed to . . . have [a] loss of vision.

Further, Richardson states that "[i]f [Owens] was admitted [to the hospital], if a neurology consultation was obtained, and if a lumbar puncture had been done[,] it is medically probable that her condition, dural sinus thrombosis[,] would have been diagnosed earlier and her vision would have been saved with treatment." As stated above, the treatments available to prevent Owens's loss of vision are also addressed by Richardson in his report.

Dr. Prater asserts that Dr. Richardson "merely state[s] that had . . . Prater diagnosed [Owens], then she might have had a better outcome" and fails to explain "how . . . Prater's conduct caused the permanent loss of vision." In other words, Richardson "does not explain how and why the complained of delay in diagnosis and treatment and the prescription of dexamethasone were substantial factors in causing [Owens's] blindness."

Contrary to Dr. Prater's assertions, however, Dr. Richardson's report "explain[s], to a reasonable degree, how and why the [alleged] breach [by Prater] caused [Owens's] injury." *See Jelinek*, 328 S.W.3d at 539–40. Richardson opines

34

that Prater's failure to "perform[] [a] lumbar puncture, order[] cerebral imaging[,] such as [a] head CT and preferably [an] MRI, admit[] [Owens to the hospital], and/or obtain[] [a] neurological consultation" resulted in a delay of the diagnosis and treatment of Owens's conditions. And "[t]his delay resulted in the development of a complication, severe vision loss due to idiopathic intracranial hypertension. Severe vision loss due to intracranial complication can generally be easily treated with medication if it is diagnosed early." With earlier detection and treatment, Owens's "vision would medically probably have been saved." *Cf. Patterson*, 412 S.W.3d at 839; *see also McKellar*, 367 S.W.3d at 485; *Woofter*, 2009 WL 3930839, at *7.

In support of their argument that it is insufficient for an expert report to merely state that a plaintiff "might have had a better outcome" without linking the expert's conclusion (that the plaintiff might have had a better outcome) to a doctor's alleged breach, Drs. Handyside and Prater rely on *Wright*. In *Wright*, the plaintiff alleged that a physician's assistant misread or misplaced an x-ray and, therefore, did not discover that the plaintiff had fractured her foot. 79 S.W.3d at 50. Approximately one month later, the plaintiff's orthopedic surgeon discovered the fracture. *Id.* The plaintiff served on the defendant health care provider the report of an expert, who stated that had the x-ray been properly read, the plaintiff "would have had the possibility of a better outcome." *Id.* at 51 (internal quotations

35

omitted).  The Texas Supreme Court, after recognizing that an expert in his report need not use any particular phrase, held that the trial court could have reasonably determined that the report did not represent a good-faith effort to summarize the causal relationship.  *Id.* at 53.  The supreme court noted that the expert in his report simply opined that the plaintiff had the "possibility of a better outcome," and did not sufficiently "link[] the expert's conclusion (that [the plaintiff] might have had a better outcome) to [the hospital's] alleged breach (that it did not correctly read and act upon the x-rays)."  *Id.* at 52–53 (internal quotations omitted).

Here, in contrast, Dr. Richardson does not simply assert that Owens would have had the "possibility of a better outcome" if not for Drs. Handyside's and Prater's alleged breaches of the standard of care.  Instead, Richardson explains that the doctors' breaches caused a delay in the diagnosis and treatment of Owens's conditions.  As stated in the report:  "Untreated dural sinus thrombosis is well known to potentially cause idiopathic intracranial hypertension."  The delay in the diagnosis and treatment of Owens "resulted in the development of a complication, severe vision loss due to idiopathic intracranial hypertension."  "It is medically probable that early diagnosis would have prevented [Owens's] later development of vision loss."  The treatments available to prevent Owens's vision loss included medication, "serial lumbar punctures," "lumboperitoneal shunt placement," and "[o]ptic nerve fenestration."  *See Khan v. Ramsey*, No. 01-12-00169-CV, 2013

36

WL 1183276, at \*9 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.) (holding expert report sufficient, where breach of standard of care caused delay in diagnosis, which resulted in "permanent disability"); *Foster v. Richardson*, 303 S.W.3d 833, 841 (Tex. App.—Fort Worth 2009, no pet.) (holding expert report adequate regarding causation because it explained how doctor's delayed diagnosis subjected patient to prolonged pain); *Gelman v. Cuellar*, 268 S.W.3d 123, 130 (Tex. App.—Corpus Christi 2008, pet. denied) (holding expert report adequate regarding breach and causation because it explained had patient "been properly monitored and timely treated post-operatively with aggressive respiratory care, she would not have developed respiratory insufficiency," which caused her "anoxic brain damage"); *In re Barker*, 110 S.W.3d 486, 491 (Tex. App.—Amarillo 2003, orig. proceeding) (concluding expert report sufficient because it explained negligent failure to recognize medical condition and delay in treatment increased severity of plaintiff's injuries).

Based on the foregoing, Dr. Richardson's report represented an "objective good faith effort" to inform Drs. Handyside and Prater of the causal relationship between their failure to adhere to the pertinent standard of care and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l); *Kelly v. Rendon*, 255 S.W.3d 665, 679 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (emphasizing expert reports "are simply a preliminary method to show a

37

plaintiff has a viable cause of action that is not frivolous or without expert support"). Accordingly, we hold that the trial court erred to the extent that it granted Drs. Handyside's and Prater's motions to dismiss Owens's claims on the ground that Richardson's expert report did not adequately address the element of causation.[15]

We sustain Owens's second issue, in part.

## Vicarious Liability

In her third issue, Owens argues that the trial court erred in dismissing her vicarious-liability claims against Memorial Hermann because an expert report is not necessary regarding such claims. Memorial Hermann asserts that dismissal of Owens's vicarious-liability claims against it is "mandatory" because Owens "failed to serve [a sufficient] expert report as to the individual physicians' conduct that [is] the basis of the vicarious liability claim[s]."

In addition to her direct-liability claims against Memorial Hermann, Owens alleges that it is vicariously liable for the conduct of its "nurses, technicians, servants and[/]or agents" and "Amy Rasmussen, M.D.; Brian Zachariah, M.D.; Krista G. Handyside, M.D.; Inez A. Serrano, P.A.; Samuel J. Prater, M.D.; [and] Kenneth A. Totz, [D.O., FACEP]."

---

[15] In her brief, Owens also asserts that Dr. Richardson's report adequately addresses the standard of care as it relates to the doctors. However, because Drs. Handyside and Prater did not object to the report on this ground, we do not consider this portion of Owens's argument.

"[W]hen a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious theory." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013); *see also Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008) ("When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient."). In other words, a report that is sufficient as to an employee, whose alleged negligent conduct a vicarious-liability claim is based, is also sufficient as to the employer health care provider. *See, e.g.*, *Ctr. for Neurological Disorders, P.A. v. George*, 261 S.W.3d 285, 295 (Tex. App.—Fort Worth 2008, pet. denied) ("[I]f the expert report is sufficient as to the claims against Dr. Ward, and we have held that it is[,] . . . then the report is sufficient as to claims against CND that are based on Dr. Ward's alleged negligence." (footnote omitted)).

Here, we have held that the trial court erred in dismissing Owens's direct-liability claims against Drs. Handyside and Prater because Dr. Richardson's expert report complies with chapter 74 regarding Owens's allegations against the doctors. Therefore, contrary to Memorial Hermann's assertion, dismissal of Owens's vicarious-liability claims against it is not "mandatory." Instead, Owens may proceed on her vicarious-liability claims against Memorial Hermann based on the

conduct of Drs. Handyside and Prater. *See Potts*, 392 S.W.3d at 632; *Gardner*, 274 S.W.3d at 671–72.

Further, we note that Owens alleges that Memorial Hermann is vicariously liable not only for the conduct of Drs. Handyside and Prater, but also for the conduct of its "nurses, technicians, servants and[/]or agents," Drs. Rasmussen, Zachariah, and Totz, and physician assistant Serrano. Because Owens may proceed on her vicarious-liability claims against Memorial Hermann based on the alleged negligence of Drs. Handyside and Prater, she may also proceed on her vicarious-liability claims against Memorial Hermann based on the alleged negligent conduct of these other individuals. *See TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 45 (Tex. 2013) (holding plaintiff's vicarious-liability claim against hospital for actions of nurses could proceed because expert report adequate regarding plaintiff's vicarious-liability claim for negligent acts of doctors); *Potts*, 392 S.W.3d at 629–32 (plaintiff entitled to proceed with her entire suit against health care provider so long as expert report valid as to one theory of liability against defendant); *Huepers v. St. Luke's Episcopal Hosp.*, No. 01-11-00074-CV, 2013 WL 1804470, at *3–5 (Tex. App.—Houston [1st Dist.] Apr. 30, 2013, no pet.) (mem. op.) (holding no further report required where amended petition added new theory of vicarious liability against hospital based on nursing negligence

because initial report sufficient as to plaintiff's vicarious-liability claim against hospital based on doctor conduct).

And because Dr. Richardson's report satisfies the requirements of chapter 74 as to Memorial Hermann's vicarious liability for the conduct of Drs. Handyside and Prater, Owens may also proceed on her direct-liability claims against Memorial Hermann.[16] *See Potts*, 392 S.W.3d at 629–32 (holding plaintiff's direct-liability claim against nursing staffing agency could proceed because expert report submitted by plaintiff supported her vicarious-liability claims); *Children's Med. Ctr. of Dall. v. Durham*, 402 S.W.3d 391, 403–04 (Tex. App.—Dallas 2013, no pet.) (concluding, because expert report valid as to vicarious-liability claims against hospital, plaintiffs' direct-liability claims against hospital "may proceed as well").

Accordingly, we hold that the trial court erred in granting Memorial Hermann's motion to dismiss Owens's direct- and vicarious-liability claims against it.

---

[16] Because Dr. Richardson's expert report is sufficient as to Owens's vicarious-liability claims against Memorial Hermann, based on the conduct of Drs. Handyside and Prater, we need not consider the report's adequacy as to Owens's direct-liability claims against Memorial Hermann. *See San Jacinto Methodist Hosp. v. McCoy*, No. 14-12-00682-CV, 2013 WL 3009318, at *5 n.3 (Tex. App.—Houston [14th Dist.] June 13, 2013, no pet.) (mem. op.). Therefore, as stated previously, we do not address the portion of Owens's second issue in which she asserts that Richardson's report is adequate as to the issues of standard of care and causation as it pertained to her direct-liability claims against Memorial Hermann.

We sustain Owens's third issue.

## Conclusion

We reverse the trial court's dismissal of Owens's health care liability claims against Memorial Hermann and Drs. Handyside, Prater, and Totz.  And we remand Owens's health care liability claims against them to the trial court for further proceedings consistent with this opinion.

Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.