

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-19-00126-CV

---

KENNETH C. HANCOCK, M.D., NOELLE CLOVEN, M.D., AND TEXAS
ONCOLOGY, P.A., Appellants

V.

ARTHUR ROSSE, INDIVIDUALLY AND AS REPRESENTATIVE OF THE
ESTATE OF CAROL ROSSE; JERALD ROSSE, INDIVIDUALLY; JOELLYN
MIMS, INDIVIDUALLY; DEANNA CHRONISTER, INDIVIDUALLY; BRENDA
BACA, INDIVIDUALLY; AND BRADLEY ROSSE, INDIVIDUALLY, Appellees

---

On Appeal from the 67th District Court
Tarrant County, Texas
Trial Court No. 067-297450-18

---

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

To treat seventy-nine-year-old Carol Rosse's endometrial carcinoma, on May 24, 2016, Appellant Kenneth C. Hancock, M.D., a gynecologic oncologist, performed a hysterectomy and bilateral salpingo-oophorectomy (removal of ovaries and fallopian tubes) with a bilateral pelvic and peri-aortic lymph node dissection.[1] Rosse, who had a cardiac stent placed in 2014, had been taking Plavix and aspirin as blood thinners. Dr. Hancock's office told Rosse to take Plavix, but no aspirin, on the day of surgery.

Three weeks later, Rosse died from a post surgical bleed despite treatment by Appellant Noelle Cloven, M.D., a gynecologic oncologist who was on call for Appellant Texas Oncology, P.A.[2]

---

[1]The facts recited in this opinion are in accordance with those alleged in the original petition, the expert report, and Appellants' brief. *See* Tex. R. App. P. 38.1(g) (stating that in a civil case, the court will accept as true the facts stated unless another party contradicts them); *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 221 n.1 (Tex. 2018) (per curiam).

[2]Based on the facts set out in Appellees' expert report, when Rosse was brought to the emergency room on June 11, 2016, a CT scan revealed a nodular mass-like opacity in her pelvis. Dr. Cloven concluded that the CT scan findings were most likely compatible with a hematoma related to Rosse's use of Plavix. Two days later, Rosse received a blood transfusion and her aspirin and Plavix were discontinued. On June 14, after she was deemed ready for discharge, Rosse's blood pressure dropped, and she developed cardiorespiratory failure. After Rosse was resuscitated, Dr. Hancock performed an exploratory laparotomy and found "a large amount of old blood and clots" and a small amount of continuous bleeding from the left pelvic node dissection. Rosse received a transfusion of eight units of blood in the operating room. She died later that day. As summarized by Appellees' counsel at the hearing

After Rosse's death, her husband and children[3] sued Dr. Hancock, Dr. Cloven, and Texas Oncology, P.A., among others, and served on them a Chapter 74 expert report[4] by Dr. Rabbie Kriakoss Hanna, M.D., a board-certified gynecologic oncologist. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351. The trial court overruled Appellants' objections to Dr. Hanna's report and denied their motion to dismiss.[5] In five issues, Appellants bring this interlocutory appeal, *see id.* § 51.014(a)(9), complaining that the trial court erred. We affirm.

---

on Appellants' motion, "This woman slowly bled to death and two doctors did not catch it, and they should have caught it."

[3]Appellees are Arthur Rosse, individually and as representative of the Estate of Carol Rosse; Jerald Rosse, individually; Joellyn Mims, individually; Deanna Chronister, individually, Brenda Baca; individually; and Bradley Rosse, individually.

[4]In order to "weed out frivolous malpractice claims in the early stages of litigation, [but] not to dispose of potentially meritorious claims," the Texas Medical Liability Act (TMLA) requires a health care claimant to serve an expert report early in the proceedings on each party against whom a health care liability claim is asserted. *Abshire*, 563 S.W.3d at 223 (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001)); *Baty v. Futrell*, 543 S.W.3d 689, 692 (Tex. 2018) (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)).

[5]The trial court found Dr. Hanna's initial, seven-page report deficient but granted the Rosses a 30-day extension to cure the deficiency. After the Rosses served the revised report that was more than twice as long, Appellants again objected, complaining that while the revised report was more detailed and did more to explain Dr. Hanna's reasoning, it did "not close the gaps in causation present in the prior report" and was based on "broad, speculative conclusions which lack[ed] specificity."

3

## II. Discussion

Appellants argue that the trial court erred by denying their challenges to Dr. Hanna's report because (1) Dr. Hanna failed to establish himself as a qualified expert to reliably opine on the causal connection between the alleged surgical injury under Dr. Hancock's care and Rosse's death almost three weeks later; (2) Dr. Hanna does not clearly describe the standards of care that Dr. Hancock is alleged to have violated; (3) Dr. Hanna is not qualified to opine on the mechanism of bleeding involving Plavix, a medicine prescribed by Rosse's cardiologist, and how it resulted in rehospitalization and then death under the care of later physicians and health care providers; (4) Dr. Hanna does not clearly describe the standards of care he believes Dr. Cloven breached, vaguely stating that she should have ordered *more* blood checks than she did; and (5) Dr. Hanna does not explain how Dr. Cloven caused Rosse's death when she, in fact, ordered blood checks, ordered that Rosse be given blood, and determined that Rosse's blood work and vital signs had returned to acceptable levels before Rosse died.

Appellees respond that the trial court did not err because Dr. Hanna is a qualified expert; the expert report needed only provide a fair summary; Dr. Hanna described the standards of care that Dr. Hancock had violated; Dr. Hanna was qualified to opine on the mechanism of bleeding involving Plavix because he is the same type of doctor as Dr. Hancock and so may criticize Dr. Hancock's decision to keep Rosse on Plavix; Dr. Hanna described the standards of care that Dr. Cloven

4

breached by not aggressively evaluating Rosse for active bleeding, by not performing serial abdominal examinations to allow for identification of physical signs that could point to continuous internal bleeding, and by not recognizing that being on Plavix put Rosse at a higher risk of continuous bleeding; and Dr. Hanna adequately explained how Dr. Cloven had caused Rosse's death.

## A. Standard of Review and Applicable Law

We review for an abuse of discretion a trial court's decision to deny a motion to dismiss based on the adequacy of an expert report. *Abshire*, 563 S.W.3d at 223; *Baty*, 543 S.W.3d at 693 & n.4. Under this standard, we defer to the trial court's factual determinations if they are supported by evidence but review its legal determinations de novo. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after a hearing, that the report "does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*). The TMLA defines an "expert report" as a

written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). An "expert" must, among other things, be "qualified on the basis of training or experience to offer an expert opinion regarding [the] accepted standards of medical care" for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim. *Id.* § 74.401(a)(2)–(3), (c); *see also id.* § 74.351(r)(5)(C) (defining an "expert" who gives opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim as "a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence").

In determining whether an expert is qualified, the trial court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim, and (2) is actively practicing medicine in rendering medical care services relevant to the claim. *Id.* § 74.401(c). Further, the proper inquiry in assessing a doctor's qualifications to submit an expert report is not his area of expertise but rather his familiarity with the issues involved in the claim before the court. *Estorque v. Schafer*, 302 S.W.3d 19, 26 (Tex. App.—Fort Worth 2009, no pet.).

An expert report need not marshal all of the plaintiff's proof, but it must discuss the standard of care, breach, and causation with sufficient specificity within its four corners to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. *Baty*, 543 S.W.3d at 693–94 (citing *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52–53 (Tex. 2002); *Palacios*, 46 S.W.3d at 875, 878). We must view the report in its entirety rather than isolating specific portions or sections. *Id.* at 694.

## B. Dr. Hanna's Expert Report

In his 15-page revised expert report, Dr. Hanna set out his qualifications as a board-certified gynecologic oncologist who had "been actively involved in the medical and surgical training and teaching of fellows, residents[,] and medical students in a variety of training programs in addition to caring for complex surgical patients" and who had performed "surgeries for patients with endometrial cancer on over 1000 patients."

After setting out a recitation of Rosse's case, Dr. Hanna explained that Plavix works to prevent platelets within blood from forming clots to keep blood flowing smoothly in the body, that its use "increases the risk of surgical bed bleeding intraoperatively and postoperatively by 20–50%," and that such bleeding increases the risk of surgical complications and death. He opined that a patient taking Plavix with an elective surgery scheduled (as Rosse's was) "should have her Plavix discontinued for 5–7 days unless there is a medical reason not to, such as is the case if the surgery is

7

emergent or if the patient's cardiac condition requires continuation of Plavix preoperatively." And he noted that if the surgeon decides to continue the Plavix without interruption preoperatively, both the patient and surgeon "should be aware of the high risk of intra- and postoperative bleeding, the consequences of such[,] and the various signs/symptoms, and methods to address such."

Dr. Hanna noted that after a patient taking Plavix undergoes surgery, her postoperative hemoglobin should be compared to its preoperative value and a postoperative decrease in hemoglobin levels could be reflective of an intra-abdominal bleed that was either present but unnoticed during surgery or that could have started after surgery. He listed other signs of postoperative bleeding to include low blood-pressure levels that are not comparable to preoperative levels, abdominal distension, and symptoms of anemia such as dizziness, fatigue, and fainting.

Dr. Hanna stated that if a decrease in hemoglobin is identified, even without the presence of other symptoms, "the surgeon has the duty to investigate if there is a postoperative bleeding event" by performing a thorough examination of the patient and surgical site and by obtaining radiologic imaging, such as a CT scan, to exclude or confirm the presence or absence of postoperative bleeding. And he stated that if postoperative bleeding is identified, the surgeon has a duty to take appropriate measures to stop it, either medically—stopping the Plavix, providing any necessary blood or platelet transfusions, and continuing to monitor hemoglobin levels—or surgically by coiling the bleeding vessel or through surgical re-exploration to address

8

the affected area and stop the bleeding. He also stated that the consequences of a failure to diagnose a postoperative bleed would be to deprive major organs of blood supply leading to organ failure and eventually death, summarizing the consequences as "a direct proportional correlation between the extent of blood loss, its duration, the time it is diagnosed/addressed[,] *and* the extent of organ(s) failure." Dr. Hanna concluded his recitation of the standard of care by stating that the longer the period between the bleeding and the eventual diagnosis thereof, the smaller the chances that the organ or organs are able to tolerate blood loss, ending in eventual organ failure and death despite any measure taken.

Dr. Hanna then addressed how Dr. Hancock had deviated from the standards that he had described (1) by advising Rosse to continue taking Plavix until the day of surgery without discussing the risks and benefits of continuing or discontinuing it preoperatively with her or her cardiologist even though he had documented Plavix and aspirin as a surgical risk factor;[6] (2) by failing to confirm the presence or absence of postoperative bleeding when faced with abnormal laboratory values of hemoglobin despite a documented minimal blood loss during the surgery and minimal dilutional effect of the amount of intravenous fluids received during and after surgery;[7] and (3)

---

[6]In his report, Dr. Hanna referenced a 2014 report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines regarding the management of perioperative antiplatelet therapy.

[7]Dr. Hanna noted that Rosse's hemoglobin level before surgery was 14.3 g/dl and that her postoperative level was 10.0 g/dl. He stated, "A drop of hemoglobin of

9

by failing to address Rosse's documented low blood pressure on the day of discharge, 95/40, when her preoperative blood pressure values were normal to elevated, ranging from 165/85 to 136/80. He concluded that the decrease in hemoglobin and blood pressure, when compared to Rosse's preoperative values, "cumulatively raise the concern for a postoperative bleeding that should have been assessed."

Dr. Hanna opined that with regard to causation that Dr. Hancock's failure to advise Rosse to discontinue taking Plavix five to seven days prior to surgery "more likely than not led to an early postoperative bleeding manifested as a hemoglobin drop and low blood pressure on the first postoperative day[,] both of which were not individually or collectively addressed." This, according to Dr. Hanna, led to a premature discharge home with undiagnosed intraperitoneal bleeding, which was later manifested and confirmed after she returned to the emergency room, and which ultimately led to further blood loss and multiple organs shutting down without responding to all medical and surgical methods and her eventual death.

As to Dr. Cloven, Dr. Hanna noted that a postsurgical patient with low blood pressure in the presence of Plavix intake should raise the concern of internal bleeding, and that when readmitted with low blood pressure and radiologic evidence of blood accumulation, Rosse should have been evaluated for continuous bleeding aggressively

---

1 g/dl is equivalent to about a loss of one pint of blood, which is about 525 ml (almost half a liter). Hence, a 4 g/dl discrepancy would surmount to approximately two liters of blood loss."

10

by serial blood counts every four to six hours and possibly invasive testing and that the failure to do so would lead to further internal bleeding, depriving major organs of blood (oxygen and nutrition) and eventual shutdown without responding to all medical and surgical methods, and death.

Dr. Hanna stated that Dr. Cloven had diagnosed Rosse with blood collection in the pelvis but "did not take appropriate measures to ensure there was no continuous internal bleeding via active surveillance of her hemoglobin values at short intervals (every 6–8 hours) and serial abdominal examinations to ensure no physical signs of continuous blood loss" and did not consider blood or platelet transfusions soon enough, "i.e., before more blood [was] lost in order to avoid the detrimental effects of blood deprivation to major organs." He opined that if Dr. Cloven had evaluated Rosse's hemoglobin levels in a timely fashion, Rosse would have received blood products or platelets sooner or the decrease in hemoglobin levels would have triggered surgical intervention sooner, allowing her vital organs to be less affected.

Dr. Hanna enumerated Dr. Cloven's deviations from the standard of care as (1) not aggressively evaluating Rosse for active bleeding via serial hemoglobin-level evaluations within short intervals and comparing them to previous levels; (2) not performing serial abdominal examinations to allow for identification of physical signs that could point out continuous internal bleeding; and (3) not recognizing that a patient's actively taking Plavix put her at a higher risk of continuous bleeding because of permanent inhibition of platelet functions and would deprive her from clotting any

11

bleeding vessels naturally, hence leading to continuous bleeding internally. As to causation, he opined that Dr. Cloven's deviations from the standard of care "led to a significant delay in diagnosing bleeding internally, a delayed surgical response in stopping the bleeding, hence a longer deprivation period of Carol Rosse's organs from oxygenation and nutrition leading to eventual death because of multiple organ failing[,] a condition which leads to death."

Dr. Hanna summarized his report by stating that within a reasonable degree of medical probability, the following factors either individually or collectively amounted to deviations of the standard of care leading to Rosse's death: the continuation of Plavix until the day of surgery, the failure to evaluate the decrease in hemoglobin levels and abnormal vital signs following the May 24, 2016 surgical procedure, and the failure to aggressively evaluate Rosse for potential continuous internal bleeding and to manage it appropriately when she was readmitted.

## C. Analysis

### 1. Standard of Care

To adequately identify the standard of care, an expert report—by a qualified expert, *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.401—must set forth specific information about what the defendant should have done differently. *Abshire*, 563 S.W.3d at 226 (citing *Palacios*, 46 S.W.3d at 880). That is, the report must identify what care was expected but not given, *id.*, and with such specificity that inferences need not be indulged to discern them. *Cook Children's Med. Ctr. v. C.R.*, No. 02-18-

12

00248-CV, 2019 WL 1185602, at *3 (Tex. App.—Fort Worth Mar. 14, 2019, no pet.) (mem. op.) (citing *Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 270 (Tex. App.—Fort Worth 2009, no pet.)).

Appellants argue that Dr. Hanna failed to establish himself as a qualified expert to reliably opine on the causal connection between Dr. Hancock's surgery and Rosse's subsequent death and that he was not qualified to opine on the mechanism of bleeding involving Plavix. They also contend that Dr. Hanna did not clearly describe the standards of care that he believed Dr. Cloven breached.

Dr. Hanna's report establishes that he is board certified in the same practice area—gynecologic oncology—as both Dr. Hancock and Dr. Cloven, that he had performed endometrial cancer surgeries on over 1,000 patients, and that he was actively involved in medical and surgical training, "in addition to caring for complex surgical patients." Accordingly, because of his board certification in the same practice area and his active practice in rendering medical care services "relevant to the claim," we conclude that the trial court did not abuse its discretion by determining that Dr. Hanna was qualified to reliably opine on matters related to Dr. Hancock's and Dr. Cloven's medical and surgical treatment of Rosse, an elderly patient suffering from endometrial cancer, including the continued use of Plavix. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 74.351(r)(5)(C), .401(c). We overrule Appellants' first and third issues.

Further, although Appellants argue that Dr. Hanna did not clearly describe the standards of care that Dr. Hancock is alleged to have violated, Dr. Hanna's report

13

identified Dr. Hancock's conduct that was called into question as violating the standards of care—(1) advising Rosse to continue taking Plavix without discussing the risks and benefits of continuing or discontinuing it preoperatively with her or her cardiologist even though he had documented Plavix and aspirin as a surgical risk factor; (2) failing to confirm the presence or absence of postoperative bleeding when faced with the abnormal laboratory values of her hemoglobin despite a documented minimal blood loss during the surgery and minimal dilutional effect of the amount of intravenous fluids she had received during and after surgery; and (3) by failing to address Rosse's documented low blood pressure on the day of discharge, 95/40, when her preoperative blood pressure values were normal to elevated, ranging from 165/85 to 136/80—allowing the trial court to conclude that at least one of these theories had merit to support the continuation of the Rosses' claims. *See Baty*, 543 S.W.3d at 697.

Likewise, he also enumerated Dr. Cloven's deviations from the standard of care as (1) not aggressively evaluating Rosse for active bleeding via serial hemoglobin-level evaluations within short intervals and comparing them to previous levels; (2) not performing serial abdominal examinations to allow for identification of physical signs that could point out continuous internal bleeding; and (3) not recognizing that a patient's actively taking Plavix put her at a higher risk of continuous bleeding because of permanent inhibition of platelet functions and would deprive her from clotting any bleeding vessels naturally, hence leading to continuous bleeding internally. The trial court could have concluded that at least one of these theories as to each doctor had

14

merit to support the continuation of the Rosses' claims. *See id.* Accordingly, we overrule Appellants' second and fourth issues.

### 2. Causation

The causation element requires an expert to explain "how and why" the alleged negligence caused the injury in question. *Abshire*, 563 S.W.3d at 224 (citing *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010)). A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts. *Id.*; *see also Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 461 (Tex. 2017) (stating that reports without factual explanations are "nothing more than the *ipse dixit* of the experts" and thus insufficient). But the expert need not prove the entire case or account for every known fact as long as the report makes a good faith effort to explain factually how proximate cause is going to be proven. *Abshire*, 563 S.W.3d at 224; *see Cook Children's Med. Ctr.*, 2019 WL 1185602, at *3 (explaining that proximate cause's two components are foreseeability and cause-in-fact); *Estorque*, 302 S.W.3d at 28 (explaining that a causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and that absent said act or omission, the harm would not have occurred but noting that to avoid dismissal, a plaintiff need not present all the evidence necessary to litigate the merits of his case). And our job at this stage "is not to weigh the report's credibility" but rather to determine whether the expert has explained how the negligent conduct caused the injury. *Abshire*, 563

15

S.W.3d at 226 ("Whether this explanation is believable should be litigated at a later stage of the proceedings."). In short, we are to determine whether the trial court could have found that the report represented a good-faith effort to summarize the causal relationship between the doctors' failures to meet the applicable standards of care and Rosse's injury. *See Baty*, 543 S.W.3d at 698.

Causation may be shown by an expert's explaining a chain of events that starts with a doctor's negligence and ends with a patient's injury. *Owens v. Handyside*, 478 S.W.3d 172, 189 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (op. on reh'g); *McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.).

In *Owens*, for example, a medical malpractice lawsuit in which the trial court concluded that the plaintiff's expert report was deficient and dismissed the lawsuit, our sister court reversed that order and remanded the case. 478 S.W.3d at 175, 180, 193. The plaintiff had seen several medical providers—Drs. Handyside, Prater, and Totz—complaining of headaches, but they failed to diagnose what eventually was diagnosed as cerebral venous sinus thrombosis, and the delay in treatment allegedly resulted in the patient's developing blindness. *Id.* at 175–76. With respect to causation, the court walked through the report, stating,

> In regard to Dr. Prater, Dr. Richardson, in his report, states that Prater breached the standard of care by "fail[ing] to perform a lumbar puncture" on Owens, "fail[ing] to admit her" to the hospital, failing to "perform cerebral imagining[,] such as [a] head CT or [a] brain MRI," failing to "obtain a neurological consultation to have [Owens] assessed urgently despite the diagnoses of possible meningoencephalitis and possible cavernous sinus thrombosis," and failing to provide "adequate

16

neurological follow-up" after Owens was discharged from Memorial Hermann. In regard to causation, Richardson opines:

> If Dr[.] . . . Prater performed [a] lumbar puncture, ordered cerebral imaging[,] such as [a] head CT and preferably [an] MRI, admitted [Owens to the hospital] and/or obtained [a] neurological consultation, . . . Owens would have likely had a more timely diagnosis, earlier treatment[,] and her vision would medically probably have been saved. If . . . Prater had not prescribed dexamethazone for . . . Owens[,] it is medically probable that her condition would not have been exacerbated. It is possible she would not have progressed to . . . have [a] loss of vision.

Further, Richardson states that "[i]f [Owens] was admitted [to the hospital], if a neurology consultation was obtained, and if a lumbar puncture had been done[,] it is medically probable that her condition, dural sinus thrombosis[,] would have been diagnosed earlier[,] and her vision would have been saved with treatment." As stated above, the treatments available to prevent Owens's loss of vision are also addressed by Richardson in his report.

Dr. Prater asserts that Dr. Richardson "merely state[s] that had . . . Prater diagnosed [Owens], then she might have had a better outcome" and fails to explain "how . . . Prater's conduct caused the permanent loss of vision." In other words, Richardson "does not explain how and why the complained of delay in diagnosis and treatment and the prescription of dexamethasone were substantial factors in causing [Owens's] blindness."

Contrary to Dr. Prater's assertions, however, Dr. Richardson's report "explain[s], to a reasonable degree, how and why the [alleged] breach [by Prater] caused [Owens's] injury." . . . Richardson opines that Prater's failure to "perform[ ][a] lumbar puncture, order[ ] cerebral imaging[,] such as [a] head CT and preferably [an] MRI, admit[ ] [Owens to the hospital], and/or obtain[ ][a] neurological consultation" resulted in a delay of the diagnosis and treatment of Owens's conditions. And "[t]his delay resulted in the development of a complication, severe vision loss due to idiopathic intracranial hypertension. Severe vision loss due to intracranial complication can generally be easily treated with

17

medication if it is diagnosed early." With earlier detection and treatment, Owens's "vision would medically probably have been saved."

. . . .

. . . Dr. Richardson does not simply assert that Owens would have had the "possibility of a better outcome" if not for Drs. Handyside's and Prater's alleged breaches of the standard of care. Instead, Richardson explains that the doctors' breaches caused a delay in the diagnosis and treatment of Owens's conditions. As stated in the report: "Untreated dural sinus thrombosis is well known to potentially cause idiopathic intracranial hypertension." The delay in the diagnosis and treatment of Owens "resulted in the development of a complication, severe vision loss due to idiopathic intracranial hypertension." "It is medically probable that early diagnosis would have prevented [Owens's] later development of vision loss." The treatments available to prevent Owens's vision loss included medication, "serial lumbar punctures," "lumboperitoneal shunt placement," and "[o]ptic nerve fenestration."

Based on the foregoing, Dr. Richardson's report represented an "objective good faith effort" to inform Drs. Handyside and Prater of the causal relationship between their failure to adhere to the pertinent standard of care and the injury, harm, or damages claimed.

*Id.* at 189–91 (citations omitted).

A similar result is found in *McKellar*, a medical negligence case in which the trial court denied the doctor's motion to dismiss and our sister court affirmed. 367 S.W.3d at 481. A day after the pregnant patient was admitted to the hospital, one of her twin children was diagnosed with encephalopathy, allegedly from the mismanagement of the patient's labor. *Id.* Dr. McKellar challenged the report of her expert, Dr. Gatewood, as deficient on causation. *Id.* at 481–82. In affirming the trial court's order finding Dr. Gatewood's report adequate on causation, our sister court stated,

18

It is clear from Gatewood's report that [one of the twins] suffered from encephalopathy. Encephalopathy is a disease of the brain involving alteration of the brain structures. We are told that [the baby's] altered brain structure was probably caused by McKellar's failure to order continuous heart rate monitoring upon [his mother's] admission to the hospital; failure to order an ultrasound for discordance and a biophysical profile; and failure to notify labor and delivery of the decision to proceed with emergency Caesarean section at 18:35 after the consult with Dr. Gore. Finally, upon his arrival at the hospital, McKellar failed to expedite rapid response for the Caesarean section.

A fair reading of Gatewood's report is that the failure to expeditiously discover and address the recurring variable decelerations with absent long-term variability in [the baby's] heart rate resulted in [his] brain damage. Thus, the report sets forth a chain of events beginning with [the mother's] admission to the hospital when McKellar allegedly negligently failed to monitor the twins' heart rates, when he knew [the mother] was at risk for preeclampsia due to excessive edema and proteinuria, and at a time when he was aware that repeated consultations for serial ultrasounds were necessary from April through July 24. Even though such ultrasounds were routinely utilized to monitor the twins' condition due to this high-risk pregnancy prior to [the mother's] hospitalization, no such ultrasounds were ordered at a critical time when she was hospitalized. Next, McKellar failed to expedite his decision to perform an emergency Caesarean section, delaying the twins' delivery, all of which resulted in brain damage to [the baby]. The trial court was permitted to read the causation section in the context of the entire report.

*Id.* at 486 (footnotes and citations omitted).

In their final issue, Appellants argue that Dr. Hanna failed to explain how Dr. Cloven caused Rosse's death when she ordered blood checks, ordered blood, and determined that Rosse's blood work and vital signs had returned to acceptable levels

before she died.[8]  Accordingly, we review Dr. Hanna's report for an explanation of the chain of events that starts with the doctors' negligence and ends with Rosse's death.  *See Owens*, 478 S.W.3d at 189; *McKellar*, 367 S.W.3d at 485.

Dr. Hanna's report sets forth that Dr. Cloven had breached the standard of care by failing to take more active, aggressive measures after diagnosing Rosse with blood collection in her pelvis, and he listed the measures that, in his opinion, should have been taken to prevent Rosse's death.  He opined that Dr. Cloven's deviations from the standards of care "led to a significant delay in diagnosing bleeding internally, a delayed surgical response in stopping the bleeding, hence a longer deprivation period of Carol Rosse's organs from oxygenation and nutrition leading to eventual death because of multiple organ failing[,] a condition which leads to death."  That is, his report made a good faith effort to explain "how and why" Dr. Cloven's alleged negligence led to Rosse's death by explaining the basis of his statements and by linking his conclusions to the facts of Rosse's case.  *See Abshire*, 563 S.W.3d at 224; *Polone v. Shearer*, 287 S.W.3d 229, 237 (Tex. App.—Fort Worth 2009, no pet.) (holding that expert's opinion that doctors' failure to meet the standards of care regarding

_____

[8]Appellants also complain, "[T]here are three gaps here that need expert explanation.  And Dr. Hanna is not qualified on any of them.  First, did Ms. Rosse bleed for three weeks?  Second, did Plavix cause the bleeding?  Third, did this bleed cause her death?"  But these are ultimately fact questions for a factfinder rather than the mere "fair summary" required by an expert report, and the lawsuit is not against the maker of Plavix but rather the doctors and their actions and inactions with regard to Rosse's treatment.

20

evaluation and management of breast mass and interpretation of mammography and breast sonography *increased* risks of metastatic breast cancer and subsequent morbidity and mortality was not conclusory); *see also Palacios*, 46 S.W.3d at 880 (stating that a "fair summary" must set out what care was expected, but not given); *cf. Kettle v. Baylor Med. Ctr. at Garland*, 232 S.W.3d 832, 838 (Tex. App.—Dallas 2007, pet. denied) (holding that expert's opinion that "all the physician-defendants collectively shared the same duty to diagnose and treat Kettle's condition 'promptly' or 'earlier'" was too vague and general to satisfy *Palacios*).

A trial court abuses its discretion only when it acts in an arbitrary or unreasonable manner without reference to any guiding principles or rules. *Wright*, 79 S.W.3d at 52. Under this standard, the trial court in this case did not abuse its discretion by concluding that Dr. Hanna's report represented an objective, good-faith effort to comply with the definition of an expert report on the issue of causation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *McKellar*, 367 S.W.3d at 486. Accordingly, we overrule Appellants' fifth issue.

### III. Conclusion

Having overruled all of Appellants' issues, we affirm the trial court's order and remand the case for further proceedings.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered: January 30, 2020

21