# Supreme Court of Texas

No. 23-0460

Jared Bush, Jr.,

*Petitioner*,

v.

Columbia Medical Center of Arlington Subsidiary, L.P. d/b/a
Medical City Arlington and HCA Inc.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Second District of Texas

**Argued September 12, 2024**

JUSTICE HUDDLE delivered the opinion of the Court, in which Chief Justice Blacklock, Justice Lehrmann, Justice Boyd, Justice Busby, Justice Young, and Justice Sullivan joined.

JUSTICE BLAND filed a dissenting opinion, in which Justice Devine joined.

Health care liability claimants must timely serve an adequate expert report to each defendant. A report is adequate if it "provides a fair summary of the expert's opinions." TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6). In this medical malpractice case, the trial court twice

held that a timely served expert report was adequate. The court of appeals disagreed and ultimately dismissed the plaintiff's claims against a hospital with prejudice, concluding that the expert's amended report was deficient because his causation opinion was conclusory. We hold that the trial court did not abuse its discretion in concluding that the report adequately supported the claim against the hospital. Accordingly, we reverse the judgment of the court of appeals and remand to the trial court for further proceedings.

## I. Background

As alleged, 35-year-old Ireille Williams-Bush fainted and was taken by ambulance to Medical City Arlington Hospital. She presented with symptoms consistent with a pulmonary embolism (a blood clot in the lungs): chest pain, shortness of breath, and severe fainting. But the emergency room doctor's initial impression was that she had suffered a non-ST-elevated myocardial infarction (a type of heart attack), so the hospital admitted her under that diagnosis.[1] The consulting cardiologist performed a cardiac catheterization procedure on Williams-Bush but never screened her for pulmonary embolism. Williams-Bush was later discharged in stable condition with instructions to follow up in two weeks. Three days after her discharge, she was found in bed, struggling to breathe. She was rushed to the hospital but died that day. An autopsy revealed clotting in her heart and lungs.

---

[1] Williams-Bush was initially seen by Shalako Bradley, D.O. and was admitted and eventually discharged by hospitalist Zakari Tanimu, M.D., who consulted with cardiologist Atif Sohail, M.D.

2

Williams-Bush's husband, Jared Bush (acting individually and on behalf of his wife's estate and their two children), sued Columbia Medical Center of Arlington Subsidiary, L.P. d/b/a Medical City Arlington and HCA, Inc. d/b/a HCA Healthcare (together, the Hospital), as well as the emergency room doctor, the admitting hospitalist, the consulting cardiologist, and those physicians' practice groups, for negligence. We focus on the adequacy of the expert report's theory of liability against the Hospital because the claims against the physicians and their practice groups are not at issue here. With respect to the Hospital, Bush alleges that "the acts and/or omissions of [the Hospital] constituted deviations from the applicable standards of care in numerous respects including," among other things, "[f]ailure to have and/or enforce adequate protocols, policies and/or procedures."

***The first report.*** Bush timely served the Hospital with an expert report prepared by Dr. Cam Patterson, a board-certified cardiologist with over twenty years of experience in clinical practice and education. Dr. Patterson has also served in administrative roles as Chief of the Division of Cardiology at the University of North Carolina at Chapel Hill, the physician-in-chief of the UNC Center for Heart and Vascular Care, and the Executive Director of UNC McAllister Heart Institute.

The Hospital objected to the report and moved to dismiss Bush's claims on the grounds that (1) Dr. Patterson was either unqualified to opine on standards of care for hospital policies or the statements about his qualifications were conclusory and (2) his opinions about the Hospital's breach of the standard of care and about causation were conclusory. *See id.* § 74.351(a) (allowing the defendant to object to an

3

expert report's sufficiency), (b) (requiring dismissal on a defendant's motion when "an expert report has not been served"). The trial court denied the motion, and the Hospital appealed. *See id.* § 51.014(a)(9). The court of appeals reversed, holding the report failed to establish Dr. Patterson's qualifications to testify about the Hospital's standard of care and, alternatively, that his opinions about standard of care, breach, and causation were conclusory and therefore did not comply with Chapter 74's "good-faith" requirement. *Columbia Med. Ctr. of Arlington Subsidiary, L.P. v. J.B.* (*Bush I*), No. 02-20-00190-CV, 2021 WL 5132535, at *8–10 (Tex. App.—Fort Worth Nov. 4, 2021, no pet.).

The court of appeals reasoned that the Hospital's alleged violations of the standard of care—the failure to have a proper protocol to ensure Williams-Bush was properly evaluated and treated and allowing her to be discharged—"implicate the practice of medicine." *Id.* at *8. It noted that "[a] hospital cannot practice medicine and therefore cannot be held directly liable for any acts or omissions that constitute medical functions." *Id.* (alteration in original) (quoting *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 415 (Tex. App.—Fort Worth 2003, no pet.)). Thus, the court concluded that the expert's report was deficient if it did not explain "how his opinions do not implicate the practice of medicine":

> If such things as establishing administrative polic[i]es on ordering particular tests and discharging patients *aren't* medical functions, an expert purporting to pin direct rather than vicarious blame on a hospital for a policy or protocol failure should reasonably be expected to explain how his opinions do not implicate the practice of medicine, even at this preliminary stage.

4

*Id.* The court of appeals purported to draw support for its conclusion from *Columbia Valley Healthcare System, L.P. v. Zamarripa*, 526 S.W.3d 453 (Tex. 2017). In *Zamarripa*, a physician ordered a pregnant woman to be transferred to another hospital in an unhealthy condition, and the plaintiff's expert asserted that the hospital was negligent because its nurses "permitt[ed] and facilitat[ed] her transfer." *Id.* at 457–58. We held the expert's report was insufficient because it failed to explain "how [the hospital] had either the right or the means to persuade [the physician] not to order the transfer or to stop it when he did." *Id.* at 461. Relying on that holding, the court of appeals held that Dr. Patterson's report was similarly deficient. *Bush I*, 2021 WL 5132535, at *9. On this point, the court reasoned that the report did not explain how the Hospital's "policies, procedures, and protocols—which can be implemented only through its nurses and staff—could have changed what the *physician* did in ordering tests, making his diagnosis, and discharging [Williams-Bush]." *Id.* The court of appeals reversed and remanded, allowing the trial court to consider whether to grant a thirty-day extension to cure the report's deficiencies. *Id.* at *10; *see* TEX. CIV. PRAC. & REM. CODE § 74.351(c).

***The amended report.*** Dr. Patterson filed an amended report setting forth his qualifications and opinions on standard of care, breach, and causation.[2] Central to this appeal is Dr. Patterson's opinion that "[h]ospitals that treat acute cardiovascular patients are required to have systems-based polic[i]es, protocols and procedures to ensure patients are

---

[2] The Hospital did not challenge Dr. Patterson's qualifications as set forth in the amended report.

5

treated and managed appropriately." Their purpose, according to Dr. Patterson, is "to ensure that patients presenting with chest pain, shortness of breath and severe syncope [i.e., fainting] are properly evaluated, assessed, tested, treated and diagnosed." Dr. Patterson describes the different systems within a hospital that must work together to provide patient care, and he explains that the standard of care for this systems-based operation "requires appropriate development, implementation, training and enforcement of policies and procedures regarding the evaluation, identification and communication related to treating acute cardiac patients." He explains that "every hospital treating acute cardiovascular patients has a responsibility to ensure that the systems-based procedures and protocols are appropriately developed, implemented, and enforced through proper education and training to providers involved, including nurses, medical staff and physicians."

For someone presenting with Williams-Bush's symptoms and medical history, i.e., a female in her mid-thirties on oral contraceptives with no other cardiac risk factors, Dr. Patterson opines that the Hospital must have "appropriate hospital polic[i]es, protocols and procedures [that] would have required specific steps be undertaken, such as order sets for imaging and lab work, to ensure that a massive pulmonary embolism was ruled out as a life-threat[en]ing etiology of her symptoms." Dr. Patterson recounts his experience as a hospital administrator developing, implementing, and enforcing what he refers to as "systems-based 'Triple Rule Out' protocols to ensure that critical cardiac pathologies, including aortic dissection, pulmonary embolism

6

and coronary artery disease, are appropriately considered, investigated and ruled out in every hospital patient presenting with signs and symptoms similar to those in this matter." The Triple Rule Out protocol "requires either a series of test[s] or specific protocol[s] to perform imaging studies to include or exclude pulmonary embolism as a diagnosis, such as a protocol for performing [a] CT angiogram, which is a triple rule out study." According to the amended report, hospitals must have and enforce this protocol "to be activated under appropriate conditions, such as this," because it "helps clinicians rule out, or in, three of the most life-threatening critical conditions of chest pain," including pulmonary embolism, "in one single scan." These policies, procedures, and guidelines "ensure appropriate communication between providers and interdisciplinary teams involved in individual patient care."

Dr. Patterson opines that the Hospital breached the standard of care by failing to adopt and enforce such a protocol and that breach was a direct and proximate cause of Williams-Bush's death. His report states that the failure to "have policies, protocols and procedures in place, to ensure pulmonary embolism was ruled out as a potential underlying etiology," was a violation of the standard of care that led to "a life-threatening condition" not being "appropriately assessed, monitored, diagnosed and treated, which greatly increased the risk of a fatal thromboemboli [i.e., clotting] event, which ultimately occurred." As a result of the Hospital's failure to adopt such a policy, "a proper workup was never completed[,] which resulted in a lack of appropriate communication between interdisciplinary providers and the massive pulmonary embolism was never appropriately ruled out as the

7

underlying etiology of symptoms nor treated prior to discharge." The amended report opines that, "[a]s a direct result of these violations of the standard of care, [Williams-Bush] was discharged without pulmonary embolism being properly ruled out as her underlying etiology."

The Hospital moved to dismiss on the ground that Dr. Patterson's amended report was inadequate. The trial court again denied the motion, but the court of appeals reversed and directed the claims against the Hospital be dismissed with prejudice. 692 S.W.3d 606, 609 (Tex. App.—Fort Worth 2023).

In the second appeal, the court of appeals addressed only causation, and it again deemed the report conclusory. *Id.* at 612. The court reasoned that the report "still fails to explain how the mere presence of standard order sets, policies, procedures, or protocols would have overridden the actual medical decisions, diagnoses, and treatment orders of the doctors who were present and deciding how [Williams-Bush] should be managed." *Id.* at 613 (citing *Zamarripa*, 526 S.W.3d at 461). According to the court of appeals, Dr. Patterson's amended report says the policies "would be binding on the medical staff" but did "not describe *how* the hospital could enact and enforce such rules on medical decision making." *Id.* (emphasis added). The court of appeals identified several other so-called "analytical gaps":

> [I]f a doctor evaluates a patient and does not implement the hospital's protocol, what happens? Does a nurse or other hospital employee then have the authority to order the tests? If not, how does the protocol get implemented? Does it require invoking a chain of command within the hospital administration, medical staff, or otherwise? If so,

8

who all is involved and how long does it take? While the decision-making is being reviewed, who handles the patient's medical care?

*Id.* Because Bush previously had an opportunity to amend the report, the court remanded with instructions to dismiss Bush's claims against the Hospital with prejudice. *Id.* at 609.

Bush petitioned this Court for review, which we granted.

## II. Relevant law

The Texas Medical Liability Act requires health care liability claimants to timely serve an adequate expert report on each defendant. TEX. CIV. PRAC. & REM. CODE § 74.351(a). The statute imposes a modest requirement at this early stage of litigation: A report is sufficient if it "provides a *fair summary* of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6) (emphasis added). A court may dismiss the suit if the report is untimely or deficient. *Id.* § 74.351(b). However, a court shall grant a motion challenging the report's adequacy "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort" to provide the required "fair summary" of the applicable standard of care, the defendant's breach, and how that breach caused the ultimate injury. *Id.* § 74.351(*l*).

A report represents a good-faith effort if it "(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit." *Baty v.*

9

*Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018). At this threshold stage of the case, the adequacy of an expert report is measured by a "lenient standard." *Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011); *see Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012) (Hecht, J., concurring in part and dissenting in part) (describing the standard as a "low threshold"). In this context, "good faith effort" "simply means a report that does not contain a material deficiency." *Samlowski v. Wooten*, 332 S.W.3d 404, 409–10 (Tex. 2011) (plurality op.). An expert report will meet this standard if it "includes all the required elements, and . . . explains their connection to the defendant's conduct in a non-conclusory fashion." *Id.* at 410 (citation omitted). "No particular words or formality are required, but bare conclusions will not suffice." *Scoresby*, 346 S.W.3d at 556 (footnotes omitted).

At this early stage of litigation, the purpose of this low threshold is to "weed out frivolous malpractice claims," not to adjudicate potentially meritorious claims. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001)). A report is not required to "marshal all the plaintiff's proof" to avoid dismissal. *Palacios*, 46 S.W.3d at 878. In analyzing a report's sufficiency, courts must consider "only the information contained within the four corners of the report." *Abshire*, 563 S.W.3d at 223; *see also Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). We review for an abuse of discretion a trial court's decision to grant or deny a defendant's motion to dismiss based on the adequacy of an expert report. *Abshire*, 563 S.W.3d at 223. As with many discretionary decisions, "[c]lose calls

10

must go to the trial court." *Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006).

This Court has explained that a report "adequately addresses causation when the expert explains 'how and why' breach of the standard caused the injury in question by 'explain[ing] the basis of his statements and link[ing] conclusions to specific facts.'" *E.D. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022) (alterations in original) (quoting *Abshire*, 563 S.W.3d at 224).

To satisfy the causation requirement, "the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith effort to explain, factually, how proximate cause is going to be proven.'" *Abshire*, 563 S.W.3d at 224 (quoting *Zamarripa*, 526 S.W.3d at 460). Proximate cause includes both cause in fact and foreseeability. *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). Cause in fact is established by showing "the negligent 'act or omission was a substantial factor in bringing about injury,' without which the harm would not have occurred." *Id.* (quoting *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995)). An "injury is foreseeable if its 'general character . . . might reasonably have been anticipated.'" *Id.* at 478 (omission in original) (quoting *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 551 (Tex. 1985)). And though foreseeability must be addressed as a part of proximate cause, no "magical words" are required. *Zamarripa*, 526 S.W.3d at 460 (quoting *Wright*, 79 S.W.3d at 53).

The court's role with respect to causation "is to determine whether the expert has *explained* how the negligent conduct caused the

11

injury," not whether the expert has *proved* causation. *Abshire*, 563 S.W.3d at 226 (emphasis added). The "fair summary" threshold "is not an evidentiary standard, and at this early stage of the litigation, 'we do not require a claimant to present evidence in the report as if it were actually litigating the merits.'" *E.D.*, 644 S.W.3d at 667 (quoting *Abshire*, 563 S.W.3d at 226). Instead, "[t]he ultimate evidentiary value of the opinions proffered"—that is, whether there actually is a causal connection—"is a matter to be determined at summary judgment and beyond." *Id.* (alteration in original) (quoting *Abshire*, 563 S.W.3d at 226). For this reason, an "adequate" expert report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 517 (Tex. 2017) (quoting *Palacios*, 463 S.W.3d at 879).

The same lenient standard applies to the other elements of the expert's report. An expert report adequately articulates the elements of standard of care and breach when it "set[s] forth specific information about what the defendant should have done differently; that is, what care was expected, but not given." *Uriegas v. Kenmar Residential HCS Servs., Inc.*, 675 S.W.3d 787, 790 (Tex. 2023) (internal quotation marks omitted). A hospital's standard of care "is what an ordinarily prudent hospital would do under the same or similar circumstances." *Palacios*, 46 S.W.3d at 880.[3]

---

[3] Our courts of appeals have held that a hospital owes a duty to its patients "to use reasonable care in formulating the policies and procedures that govern the hospital's medical staff and nonphysician personnel." *Reed*, 117

Importantly, we have never required an expert to "anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court" as litigation proceeds. *Owens v. Handyside*, 478 S.W.3d 172, 187 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (citing *Wright*, 79 S.W.3d at 52). At this early point, whether the expert's explanation is credible, reasonable, or believable is irrelevant; those questions are to be litigated later in the proceedings. *See Abshire*, 563 S.W.3d at 226 (explaining that courts are not to "weigh the report's credibility" or question whether the expert's "explanation is believable"); *Miller*, 536 S.W.3d at 516–17 (providing that the believability of the expert's explanations is not at issue). Rather, our inquiry is confined to the narrow question of whether Dr. Patterson's amended report has made a good-faith effort to comply with the statutory requirements.

## III. Analysis

The court of appeals held that Dr. Patterson's amended report was conclusory as to causation, and therefore deficient under Chapter 74, because it did not "explain how and why Hospital policies, procedures, and protocols . . . could have changed what the *physician* did in ordering tests, making his diagnosis, and discharging [Williams-Bush] when she was in stable cardiac condition." 692 S.W.3d at 612–13 (quoting *Bush I*, 2021 WL 5132535, at *9). We disagree.

---

S.W.3d at 409; *see Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 628–29 (Tex. App.—Fort Worth 2011, pet. denied) (holding sufficient evidence supported a jury finding that the hospital's negligence in failing to implement policies and procedures relating to post-operative patients proximately caused the plaintiff's injury).

13

**A.**

The amended report adequately articulates Dr. Patterson's opinions regarding causation because it explains "how and why" the Hospital's alleged breach of the articulated standard of care led to the patient's death. *E.D.*, 644 S.W.3d at 667. That is, the amended report "draws a line directly" from the Hospital's failure to adopt policies or protocols "regarding the evaluation, identification and communication related to treating acute cardiac patients" to the physicians' failure to identify and treat Williams-Bush's pulmonary embolism, which led to the ultimate injury—her death. *Abshire*, 563 S.W.3d at 225.

With respect to cause in fact, Dr. Patterson explains that, as a result of the Hospital's failure to implement the described policies, such as a Triple Rule Out protocol, "a proper workup was never completed[,] which resulted in a lack of appropriate communication between interdisciplinary providers." Had such a workup been completed, and "had it been recognized that [Williams-Bush] was experiencing a bilateral pulmonary embolism, she would have been evaluated by a cardiac or vascular surgeon and would have *immediately* been anticoagulated, possibl[y] thrombolized and admitted for observation." (Emphasis added.) The report opines that, as a direct result of these failures, Williams-Bush suffered from a "pulmonary embolism that remained undetected and untreated, directly leading to her sudden and untimely death."

As to foreseeability, the report opines that Williams-Bush presented "with symptoms classically associated with pulmonary embolism" and that such a condition is one of the three "most

14

life-threatening critical conditions of chest pain." The report explains in detail the policies and procedures Dr. Patterson believes the Hospital should have implemented to ensure that patients presenting with symptoms like Williams-Bush's are properly screened for certain common life-threatening conditions and concludes that Williams-Bush's condition "could have been easily detected" if such policies had been in place. The expert report fairly summarizes Dr. Patterson's opinion as to how and why the Hospital's alleged failure to implement policies such as standing orders to perform appropriate tests for patients presenting with Williams-Bush's symptoms "foreseeably led to the delay in recognizing the need," *E.D.*, 644 S.W.3d at 667, to treat her for a pulmonary embolism instead of discharging her.

In sum, Dr. Patterson opines that the Hospital's failure to adopt certain policies, such as a standing order to run the Triple Rule Out protocol for patients presenting with certain symptoms, caused a misdiagnosis, which caused Williams-Bush to die from a pulmonary embolism. Because the report adequately explains the links in the causal chain, *Abshire*, 563 S.W.3d at 225–26, we hold the amended report is adequate as to causation.

In concluding otherwise, the court of appeals "exceed[ed] the scope of the fair-summary standard by impermissibly weighing the credibility of the expert's opinions." *E.D.*, 644 S.W.3d at 667. The court faulted Dr. Patterson for failing to explain why implementing the hypothesized policies would not amount to the hospital practicing medicine, which is prohibited. 692 S.W.3d at 612–13; *see, e.g.*, *Drs. Hosp. at Renaissance, Ltd. v. Andrade*, 493 S.W.3d 545, 548 (Tex. 2016)

15

(explaining that health care institutions can provide health care but only licensed doctors can provide medical care); TEX. CIV. PRAC. & REM. CODE § 74.001(a)(19) (defining "[m]edical care" as "any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished . . . by one licensed to practice medicine"); TEX. OCC. CODE § 151.002(a)(13) (defining "[p]racticing medicine" as "the diagnosis, treatment, or offer to treat" a medical condition). The court fashioned a hurdle that is neither statutorily nor judicially mandated: "[A]n expert purporting to pin direct rather than vicarious blame on a hospital for a policy or protocol failure should reasonably be expected to explain how his opinions do not implicate the practice of medicine, even at this preliminary stage." 692 S.W.3d at 613 (quoting *Bush I*, 2021 WL 5132535, at *8). This requirement impermissibly raises the standard by which the adequacy of an expert report is measured in two ways.

First, adopting the court of appeals' reasoning would essentially force experts to anticipate and refute potential defensive theories in reports they author *pre*-litigation. But nothing in Chapter 74's text contemplates such a requirement, and our precedents eschew it. This is not to say that we agree with Dr. Patterson's theory of the case. Indeed, the evidence adduced later in the litigation process, at summary judgment or trial, may ultimately demonstrate that policies of the type Dr. Patterson describes would run afoul of the law prohibiting the corporate practice of medicine. Or the evidence may demonstrate that the standard of care does not require such policies for some reason having nothing to do with the prohibition on the corporate practice of medicine. But these possibilities do not undermine our conclusion that

16

Dr. Patterson's amended report satisfies the modest requirement that governs at this stage of the litigation, which is only that he provide a good-faith explanation regarding the challenged elements of the plaintiff's claim. *See E.D.*, 644 S.W.3d at 667 (emphasizing that the "fair summary" threshold "is not an evidentiary standard, and . . . 'we do not require a claimant to present evidence in the report as if it were actually litigating the merits'" of the case (quoting *Abshire*, 563 S.W.3d at 226)); *Miller*, 536 S.W.3d at 517 (noting that our inquiry at this stage is not "[w]hether each defendant is liable . . . ; that will be answered further in the litigation process"); *Palacios*, 46 S.W.3d at 878 (explaining that "[a] report need not marshal all the plaintiff's proof" to avoid dismissal); *id.* at 879 ("[T]he information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial."); *Owens*, 478 S.W.3d at 187 (noting that an expert report "need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court" to avoid dismissal). Rather, "[t]he ultimate evidentiary value of the opinions proffered"—that is, whether there actually is a causal connection between the alleged breach and the injury—"is a matter to be determined at summary judgment and beyond." *E.D.*, 644 S.W.3d at 667 (alteration in original) (quoting *Abshire*, 563 S.W.3d at 226).

Second, imposing this requirement presumes that the Hospital's implementation of the policies and protocols Dr. Patterson describes would constitute the unlawful practice of medicine. But while Dr. Patterson's report contemplates policies of various types, it nowhere suggests that any Hospital policy would or should usurp or even

17

encroach on the role of the physicians, the only actors who may diagnose and exercise judgment to determine the proper treatment for patients. *See* TEX. OCC. CODE § 151.002(a)(13) (defining "[p]racticing medicine" as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or . . . injury"). Hospital policies may guide or suggest treatment paths without mandating them or running afoul of the prohibition on the corporate practice of medicine. *See Marsillo v. Dunnick*, 683 S.W.3d 387, 389–90 (Tex. 2024) (describing a claim based on a physician's adherence to the hospital's snakebite-treatment protocol); *Pediatrix Med. Grp., Inc. v. Robinson*, 352 S.W.3d 879, 886 (Tex. App.—Dallas 2011, no pet.) (reviewing an expert report referring to a hospital's NICU policies and procedures). Indeed, several Texas courts and the Legislature have recognized the propriety of "standing orders" through which physicians can delegate certain tasks to non-physician staff. *See* TEX. OCC. CODE § 157.005 ("A person to whom a physician delegates the performance of a medical act is not considered to be practicing medicine without a license by performing the medical act . . . ."); *id.* § 157.054 (stating the conditions under which a medical facility can have standing orders and protocols); *id.* § 157.003 (authorizing delegation of medical acts to properly qualified and certified persons in an emergency); *Mercy Hosp. of Laredo v. Rios*, 776 S.W.2d 626, 634–35 (Tex. App.—San Antonio 1989, writ denied) (describing claimed breaches of a hospital's "standing orders").

*El Paso Healthcare System, Ltd. v. Monsivais*, No. 08-18-00043-CV, 2019 WL 5616973 (Tex. App.—El Paso Oct. 31, 2019, pet. denied), illustrates that a non-physician may undertake specified medical acts

18

when authorized by a standing order despite the fact that his taking the same action in the absence of that order might constitute the unauthorized practice of medicine. The expert in that case opined the hospital breached the standard of care because it did not have its nurses and emergency medical technicians "*order* diagnostic tests," "*admit*" a patient to the hospital, "properly *diagnose*" the malady, or correctly "*treat*" the condition. *Id.* at *4 (emphases added). The court concluded that adherence to the espoused standard of care would cause these non-physician staff to unlawfully practice medicine without a license. *Id.* at *5–6. But the court contrasted this type of conduct from "standing orders" or "protocols," which do not necessarily involve the unauthorized practice of medicine:

> [W]e do not overlook that hospital medical staff might have "standing orders" or "protocols" that they are required to follow that might preauthorize them to conduct specified tests or administer treatments. The Occupations Code itself allows physicians to delegate authority in certain defined circumstances to other health care providers. . . . [A] person to whom a proper delegation was made is not considered to be practicing medicine without a license. Thus, it would hardly be a surprise for a person presenting at a hospital with complaints of chest pain and shortness of breath to have the staff initiate an immediate ECG before ever seeing a physician. In such a case, the hospital staff has not diagnosed a medical condition such as a heart attack—they have merely followed a directive developed by appropriately licensed and trained practitioners.

*Id.* at *6 (citations omitted).[4]

---

[4] Our dissenting colleagues point out that Dr. Patterson's report nowhere uses the term "standing orders." *Post* at 16 (Bland, J., dissenting). But "standing order" merely means "procedure," a term Dr. Patterson's report

19

Unlike the report found deficient in *El Paso Healthcare System*, Dr. Patterson's report asserts that the Hospital failed to develop *policies*, *protocols*, and *procedures* that would have ensured specified tests were run on a patient presenting with symptoms like Williams-Bush's. The report does not contend that the hospital staff, based on their own initiative and authority, should have ordered and run those tests. Nor does it suggest that hospital staff—as opposed to a physician—would interpret the test results. To the contrary, the report explains that proper lab work and imaging was not run due to the Hospital's failure to implement appropriate policies. This "resulted in a lack of appropriate *communication* between interdisciplinary providers and the massive pulmonary embolism was never appropriately ruled out as the underlying etiology of symptoms nor treated prior to discharge." (Emphasis added.) As Dr. Patterson's report does not call for the Hospital or non-physician staff to "diagnose" or "treat," the court of appeals erred by faulting Dr. Patterson for not refuting the claim that it

---

uses *ad nauseum*. *See Standing Order*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/standing%20order (last visited May 19, 2025) ("an instruction or prescribed procedure in force permanently or until changed or canceled"); 22 TEX. ADMIN. CODE § 169.1(12) (defining "[s]tanding delegation order" as "[w]ritten instructions, orders, rules, or procedures designed for a patient population with specific . . . sets of symptoms" and "provid[ing] a general set of conditions and circumstances when action can be instituted prior to being examined or evaluated by a physician"); *see also* TEX. R. CIV. P. 3a (referencing local rules, forms, and standing orders). In any event, as all agree, "it is the substance of the opinions, not the technical words used, that constitutes compliance with the statute." *Hickory Trail Hosp., L.P. v. Webb*, No. 05-16-00663-CV, 2017 WL 677828, at *3 (Tex. App.—Dallas Feb. 21, 2017, no pet.) (quoting *Baylor Univ. Med. Ctr. v. Rosa*, 240 S.W.3d 565, 570 (Tex. App.—Dallas 2007, pet. denied)).

would.  *See Fortner v. Hosp. of the Sw., LLP*, 399 S.W.3d 373, 382–83 (Tex. App.—Dallas 2013, no pet.) (holding an expert report adequate where the expert opined the hospital could be liable for breaching a standard of care based on hospital-implemented policies and procedures directed at non-physician staff); *see also Tex. Child.'s Hosp. v. Knight*, 604 S.W.3d 162, 178–79 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (holding an expert report sufficient when it opined that a hospital breached the standard of care for failing to have applicable policies and procedures governing post-operative assessment of surgical patients); *Methodist Richardson Med. Ctr. v. Cellars*, No. 05-19-00378-CV, 2019 WL 6486246, at *5 (Tex. App.—Dallas Dec. 3, 2019, no pet.) (deeming adequate an expert report that opined the defendant hospital was "required to involve itself in the transfer decision (at least indirectly) by adopting and enforcing appropriate policies and procedures").

For similar reasons, we disagree with the court of appeals' reliance on *Zamarripa* for the proposition that "an expert's failure to explain how a hospital could have countermanded a doctor's transfer orders rendered the expert's opinion mere *ipse dixit* and insufficient." 692 S.W.3d at 612.  The court faulted the amended report for "fail[ing] to explain how the mere presence of standard order sets, policies, procedures, or protocols would have *overridden* the actual medical decisions, diagnoses, and treatment orders of the doctors who were present and deciding how [Williams-Bush] should be managed."  *Id.* at 613 (emphasis added) (citing *Zamarripa*, 526 S.W.3d at 461).  It erred in doing so.

21

In *Zamarripa*, a patient suffered a fatal injury while being transferred from the hospital after a physician ordered the transfer. The expert report asserted "only that by 'permitting and facilitating the transfer,' [the hospital] caused [the patient] to be in an ambulance" when she suffered a fatal injury. *Zamarripa*, 526 S.W.3d at 461. We held the expert's report to be conclusory, and therefore deficient, because it lacked any factual explanation of "*how* [the hospital] permitted or facilitated [the patient's] transfer, or even whether [the hospital] had any say in the matter." *Id.*

The expert report in this case does not suffer from the same faults. Dr. Patterson's amended report explains how enforcing the proffered policies would have averted the harmful result: If the Triple Rule Out protocol had been in place, the treating physician would have received Williams-Bush's diagnostic results, which "would have confirmed the presence of the massive bilateral pulmonary embolism while [she] was in the hospital and at a time when appropriate and life-saving intervention could have easily been undertaken, such as blood thinning medication, thrombolytic and/or surgical intervention." The amended report does not call for the Hospital to countermand a physician's decisions; rather, it opines that the Hospital could have changed the outcome by adopting and enforcing policies, such as standing orders to run specified tests on patients presenting with Williams-Bush's symptoms, that would have communicated vital diagnostic information to her doctors. According to Dr. Patterson, had appropriate protocols been in place, Williams-Bush's physicians would have had the necessary

22

information to make an accurate diagnosis and provide timely treatment, avoiding her death.

We expressly recognized the potential merit of such a claim in *Zamarripa*. Although we concluded the expert report was deficient, we remanded to allow amendment of the report, leaving open the possibility that the hospital may have breached the standard of care "in not providing [the physician] information that would have persuaded him to change his mind" about the transfer. *Id.* Here, Dr. Patterson similarly claims that the Hospital's failure to implement appropriate policies breached the standard of care and caused Williams-Bush's death because her physicians were not provided information that might have persuaded them to change their minds about her diagnosis and ultimate discharge.

The report in *Zamarripa* failed to explain how the hospital "had either the right or the means to persuade [the physician] not to order the transfer or to stop it when he did." *Id.* By contrast, Dr. Patterson's report explains how the Hospital had "the means" to avoid this harmful result—not by persuading her physicians not to discharge her but by adopting protocols to ensure appropriate tests were run and results communicated to her doctors. The test results would have provided the physicians with the critical information needed to accurately diagnose and treat Williams-Bush. As a result of the Hospital's failure to implement such policies, "a proper workup was never completed[,] which resulted in a lack of appropriate communication between interdisciplinary providers." The amended report is a "fair summary" of Dr. Patterson's opinion that the Hospital breached a standard of care by

23

failing to develop and implement appropriate policies, which caused Williams-Bush's death because an appropriate policy could have ensured vital information was communicated among the providers of Williams-Bush's care in time to treat the pulmonary embolism and avoid her death.

The dissenting justices fault the report for not identifying a specific Hospital employee's conduct that contributed to the harm. *Post* at 1–2 (Bland, J., dissenting). But this misunderstands the nature of the allegations. The claim against the Hospital at issue here is based on the asserted failure of the Hospital, acting through its management or administrators, to adopt policies that would have prompted Hospital employees responsible for treating Williams-Bush to run the Triple Rule Out protocol or similar tests. That claim is predicated on the action or inaction of administrators rather than the conduct of a nurse or other medical care provider involved in treating Williams-Bush.

In short, because Bush's claim is premised on the theory that Hospital *administrators* breached a standard of care by failing to adopt the specified policies, the expert report did not need to identify any additional alleged negligence on the part of Hospital employees responsible for treating Williams-Bush. Here, the expert opined that the absence of appropriate policies and procedures resulted in "a lack of appropriate communication" between the Hospital's employees and the treating physicians such that "the massive pulmonary embolism was never appropriately ruled out." There is no requirement to identify those specific employees who allegedly should have but failed to adopt policies the claimant theorizes were required. Indeed, at this stage of

the litigation, the expert would not be expected to know the names or titles of those employees in the Hospital's administration with responsibility for developing the policies or procedures the expert asserts were needed.

We similarly disagree with the dissenting justices' attempt to recast Bush's claim against the Hospital as an attempt to impose vicarious liability based on *the doctor's* alleged negligence. We of course agree that, had Bush sought to hold the Hospital vicariously liable for the alleged negligence of Dr. Sohail—an independent contractor—that claim would fail. *See Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 609 (Tex. 2002) (holding that an employer's "failure to implement . . . a safety rule is not actual control" over its independent contractor's employees sufficient to impose vicarious liability). But that is not what is happening here. The expert report opines that the Hospital breached its duty to implement policies that govern the work of non-physicians. The Hospital directs and participates in a patient's care, and the expert opines that it should have had "policies or procedures in place[] to ensure the safety of patients." By not implementing certain protocols and directing its non-physician employees to follow them, the expert opines that the Hospital itself was negligent and caused a lack of communication that resulted in Williams-Bush's misdiagnosis. While an independent-contractor physician, in the exercise of independent medical judgment, could conceivably "opt out" of the protocol or disregard information the Hospital's employees provide and thereby impact causation in a case in which the Hospital had adopted such a

25

protocol, the expert need not rule out every potential defense to causation.[5] *See E.D.*, 644 S.W.3d at 667; *Abshire*, 563 S.W.3d at 226.

Citing "analytical gaps in causation," the court of appeals required Dr. Patterson to provide a level of detail beyond this "fair summary" standard. 692 S.W.3d at 613. We conclude the court erred by "improperly examin[ing] the merits of the expert's claims when it identified what it deemed an 'analytical gap.'" *Abshire*, 563 S.W.3d at 226. The purported "gaps" go to facts not before the expert; indeed, the court of appeals faulted the amended report for failing to explain how the Hospital could implement the proposed procedures if a physician hypothetically were to refuse to implement them. This may be fertile ground for cross-examination, but at this early stage of the litigation, "[o]ur inquiry is not so exacting." *Miller*, 536 S.W.3d at 516. At this preliminary stage, an expert report is not required to designate every detail for implementing a protocol or policy that the expert

---

[5] The dissenting justices cite two cases for the proposition that Texas courts deem a report conclusory when the expert fails to explain how a policy would realistically be enforced. *Post* at 11–12 n.35 (Bland, J., dissenting) (citing *Hendrick Med. Ctr. v. Conger*, 298 S.W.3d 784 (Tex. App.—Eastland 2009, no pet.), and *Webb*, 2017 WL 677828). Neither expert in those cases provided any detail beyond the bare assertion that policies would have prevented the harm. *See Conger*, 298 S.W.3d at 789–90 (opining that a policy would have "reduced the likelihood that mistakes will be made"); *Webb*, 2017 WL 677828, at *7 (holding a report conclusory because it "fail[ed] to state how the absence of the listed policies would have kept this particular incident from happening"). Here, by contrast, we have explained how Dr. Patterson's report goes beyond bare assertions by adequately explaining how and why the presence of the Triple Rule Out protocol would have avoided Williams-Bush's death: following the protocol would have identified the pulmonary embolism from which she suffered at a time when life-saving interventions could have been taken.

26

contends the standard of care required. *See Abshire*, 563 S.W.3d at 227 (explaining a report that did not "designate a specific documentary procedure that should have been used" was not deficient regarding standard of care because such detail "is simply not required at this stage of the proceedings" (quoting *Baty*, 543 S.W.3d at 697)). The "gaps" identified by the court of appeals go to issues that cannot be answered without discovery. The Hospital might successfully establish on summary judgment or later that the causal link between Dr. Patterson's policies and Williams-Bush's death is too attenuated or that the Hospital could not implement the described policies without unlawfully practicing medicine. But those questions need not be answered definitively at this point as the only inquiry before us is whether the amended report is a "fair summary" of Dr. Patterson's opinions. To satisfy Chapter 74, an expert's report must only make a "good faith effort" to identify the breach of the standard of care and its causal relationship to the injury so the court can determine if the claim has potential merit. TEX. CIV. PRAC. & REM. CODE § 74.351(*l*). The amended report achieves that goal. *See Baty*, 543 S.W.3d at 697 ("Additional detail is simply not required at this stage of the proceedings."); *Fortner*, 399 S.W.3d at 383 (holding adequate an expert report that opined the defendant-hospital's breach in failing to adopt policies and procedures caused a patient's blindness and rejecting the hospital's contrary arguments as "demand[ing] too much from the expert report").

We conclude that the amended report satisfies the statutory requirements. It states that the Hospital's alleged breach was a factor that contributed to Williams-Bush's misdiagnosis "at a time when

27

appropriate and life-saving intervention could have easily been undertaken." It explained that the Hospital's alleged breach—"failing to have appropriate polic[i]es, protocols and procedures in place, [and] failing to appropriately train providers and interdisciplinary teams"—delayed timely diagnosis and proper treatment, which in turn caused Williams-Bush to die from a pulmonary embolism before it could be identified and treated.

To be sure, it is possible that the evidence at summary judgment or beyond may demonstrate that something about the manner, or timing, of Williams-Bush's presentation or test results made it unnecessary to rule out a pulmonary embolism. The evidence may also show that, due to some fact not yet known to Dr. Patterson, a pulmonary embolism could not have been detected before Williams-Bush was discharged. Or the Hospital may proffer evidence that the standard of care does not require the creation and implementation of these policies, as Dr. Patterson claims. But those are evidentiary matters to be developed during discovery and resolved at a later time. For today, all we need decide is whether the report sufficiently informs the Hospital of the specific conduct at issue and provides a basis for the trial court to conclude that the plaintiff's claims are not frivolous. Because the report does so, no more is required. *See Methodist Hosps. of Dall. v. Yates*, No. 05-21-00039-CV, 2022 WL 202988, at *6–7 (Tex. App.—Dallas Jan. 24, 2022, no pet.) (finding adequate a report faulting a hospital for failure to implement a policy that would have required scans to rule out a medical condition prior to discharge); *Methodist Richardson Med. Ctr.*, 2019 WL 6486246, at *6 (finding report adequate because it is not

28

frivolous to suggest the extent to which the defendant hospital adopted appropriate policies would have influenced a physician's medical decision). We hold that the amended expert report was sufficient with respect to causation, and the court of appeals erred by holding to the contrary.

**B.**

The court of appeals reversed based on causation without reaching the Hospital's remaining challenges to Dr. Patterson's amended report. Rather than remand for the court of appeals to do so, we will address these issues in the interest of judicial economy. *See Baty*, 543 S.W.3d at 697–98 (addressing the issues of breach and causation when the court of appeals only considered standard of care); *see generally Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 855 (Tex. 2011) ("The court of appeals did not address this issue, but rather than remanding to the court of appeals for it to do so, we address it in the interest of judicial economy."); TEX. R. APP. P. 53.4 (allowing parties to raise, and the Court to consider, issues briefed but not decided in the court of appeals).

For many of the same reasons discussed above, we conclude the amended report contains an adequate summary of Dr. Patterson's opinions regarding the applicable standard of care and the Hospital's alleged breach thereof. The report "expressly references the 'specific conduct the plaintiff has called into question.'" *Baty*, 543 S.W.3d at 695 (quoting *Palacios*, 46 S.W.3d at 879). Here, Dr. Patterson's amended report opines that the applicable standard of care "requires appropriate development, implementation, training and enforcement of policies and

29

procedures regarding the evaluation, identification and communication related to treating acute cardiac patients." Dr. Patterson opines that the standard of care required the Hospital to "have systems-based polic[i]es, protocols and procedures to ensure patients are treated and managed appropriately." In his opinion, based on Williams-Bush's clinical presentation, "appropriate hospital polic[i]es, protocols and procedures would have required specific steps be undertaken, such as order sets for imaging and lab work, to ensure that a massive pulmonary embolism was ruled out as a life-threat[en]ing etiology of her symptoms." The amended report further opines that the standard of care required the Hospital to "have and enforce the Triple Rule Out protocol to be activated under appropriate conditions," such as when a patient presents with the same clinical presentation as Williams-Bush did.

The amended report also adequately describes the alleged breach of the relevant standard of care: Dr. Patterson opines that the Hospital "violated the standard of care by not having appropriate policies, procedures, guidelines or protocols in place to ensure proper evaluation, assessment, testing, treatment and diagnosis." The report additionally explains that the Hospital "violated the standard of care by not having, and/or enforcing compliance with, appropriate clinical pathways to ensure appropriate testing is conducted to rule out medical emergencies, such as pulmonary embolism."

We hold that the amended report satisfies Chapter 74's requirement to provide a fair summary of Dr. Patterson's opinions regarding the standard of care and alleged breach. Having addressed

all the Hospital's challenges to the amended expert report, we conclude that the trial court did not abuse its discretion by denying the Hospital's motion to dismiss.

## IV. Conclusion

The question at this early stage of the litigation is not whether the Hospital may ultimately be held liable for Williams-Bush's death. Rather, we need only answer whether Dr. Patterson's amended expert report provides a fair summary of his opinions regarding the applicable standard of care, the Hospital's alleged failure to meet that standard, and the causal relationship between that alleged failure and Williams-Bush's death. We conclude that it did, and the trial court did not abuse its discretion in overruling the Hospital's objections to the amended report and denying the Hospital's motion to dismiss. For these reasons, we reverse the court of appeals' judgment and remand this case to the trial court.

Rebeca A. Huddle
Justice

**OPINION DELIVERED:** May 23, 2025